948 F.Supp. 1396 (1996)
Delores J. MASTIO, Plaintiff,
v.
WAUSAU SERVICE CORP., et al., Defendants.
No. 4:94 CV 1253 DDN.
United States District Court, E.D. Missouri, Eastern Division.
October 15, 1996.
*1397 *1398 *1399 Charles L. Wiest, Jr., St. Louis, MO, for plaintiff.
Charles E. Reis, IV, Brown and James, St. Louis, MO, for defendants.

MEMORANDUM
NOCE, United States Magistrate Judge.
This matter is before the court upon the motion of defendants for summary judgment (Doc. No. 23). The parties have consented to the exercise of jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(3).
Plaintiff Delores J. Mastio commenced this action against defendants Wausau Service Corporation; Employers Insurance Company of Wausau, doing business as Wausau Insurance Companies; and Nationwide *1400 Insurance. In Count I, she alleges that defendants sexually harassed and sexually discriminated against her, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. In Count II, she alleges that she was retaliated against, in violation of Title VII, because she filed a charge of discrimination with the Equal Employment Opportunity Commission and because she advised another employee to report discrimination to the legal office of defendant Wausau Insurance Companies. In Count III, she alleges that she was discriminated against, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., because she has a record of suffering from a psychiatric disorder or condition or was perceived by defendant as suffering from such condition.
Defendants have moved for summary judgment. Plaintiff opposes the motion.

Factual Background
1. Plaintiff is a female who was employed by defendant Wausau Insurance Companies in its St. Louis County office from December 17, 1980, to April 30, 1993. (Complaint at ¶ 3; Pl.'s Exh. 1.)
2. Plaintiff's supervisor was John Bosshard, human resources manager of the Kansas City, Missouri, office. (Bosshard Dep. at 6; Pl.'s Dep., Vol I, at 23.) Bosshard hired plaintiff in 1980 as a personnel and office services assistant. (Bosshard Dep. at 15, 17; Pl.'s Dep., Vol. I, at 21; Pl.'s Exh. 1.) While Bosshard was plaintiff's supervisor, he rarely went to the St. Louis office and plaintiff essentially performed her duties on her own. (Pl.'s Dep., Vol. I, at 37-44.) From 1981 to 1987, plaintiff's responsibilities included interviewing prospective candidates, meeting with department heads concerning those candidates, termination, exit interviews, supervising office staff, and conducting general meetings and meetings of managers. (Pl.'s Dep., Vol. I, at 29-31.) From 1987 to 1992, plaintiff's title changed to human resource specialist, but there were virtually no changes in her duties and responsibilities. (Id. at 45.) Plaintiff was also named as a regional training director in 1987. (Id. at 45-47.) As a trainer for Wausau personnel, she provided training on a variety of subjects, including sexual harassment, coaching, managing change, delegation and motivation. (Id. at 107-08; Bosshard Dep. at 113-14, 126-127.) Plaintiff was responsible for acting as trainer for the St. Louis and Kansas City offices. (Pl.'s Dep. at 108.)
3. In July 1991, plaintiff was upset by a statement that she alleges Bosshard made to the effect that women do not belong in the business world. Plaintiff informed Bosshard that the statement was inappropriate. (Pl.'s Dep., Vol. II, at 25.)[1]
4. In May 1992, it was announced that certain commercial operations of Wausau and Nationwide Insurance Companies were going to be consolidated in the West and South Central Regions, which included St. Louis and Kansas City. (Mayo Dep., Vol. I, at 31, 78-79.) Within thirty days of the announcement of the reorganization of commercial operations, task groups were formed in each area to deal with the reorganization. (Mayo Dep., Vol. 1, at 79.) Cecil Mayo was assigned to the task team concerning human resources. (Mayo Dep., Vol. I, at 81-82.)
5. On May 28, 1992, plaintiff was in Kansas City to present a seminar on motivation and delegation for the managers in Wausau's Kansas City office. (Pl.'s Dep. at 113-114; Bosshard Dep. at 279-80.) The motivational part of the seminar focused on how to meet the needs of employees and how to motivate employees with differing needs. (Bosshard's Dep. at 280-82.) Plaintiff encouraged the participants to contribute in these sessions. (Pl.'s Dep. at 129-131.) The seminar was held at a conference room in the Kansas City office. (Id. at 118.) Present at the seminar were the following managers: Michael Samsel, regional claims manager; Larry King, property underwriting manager; Rob Ruskanen, loss control services manager; Tom Baker, commercial underwriting manager; Keith Affield, regional auditor manager; Marilyn Salvato, bond manager; John Bosshard, regional human resources manager; and Greg Getting, regional sales manager. (Pl.'s Dep., Vol. I, at 124; Def.'s Exh. B at ¶ 10.) Before the seminar, Marilyn Salvato *1401 told Bosshard that she had to leave the seminar midway through the program to attend a picnic or golf outing for an association meeting. Bosshard said, "I wish I could work like that" or "It's tough work, somebody's got to do it." (Bosshard Dep. at 284.)
6. Near the end of the motivation period of the seminar, Keith Affield made the comment that it was difficult managing men and women, a comment which plaintiff did not think was inappropriate. (Pl.'s Dep. at 128.) Affield also stated that it was difficult to figure out the needs of women. (Pl.'s Dep. at 128.) Marilyn Salvato then stated that she manages men and women and she didn't see any difference in them. (Pl.'s Dep. at 129.) Affield then stated, "No, you can never satisfy the needs of women." (Pl.'s Dep. at 129.) After Affield made that comment, plaintiff did not say anything. However, Salvato stated that she thought it was sexual harassment and that a letter should be posted on it. (Pl.'s Dep. at 137-38.) Bosshard then said, "What's there to manage? Women don't do any work out there. What's there to manage? Women don't do any work around here." (Pl.'s Dep. at 138-39; Bosshard Dep. at 285.) Getting then stated, "Yeah, that's right. Go out there in the office. You won't see any women working." (Pl.'s Dep. at 139.) After these comments were made, plaintiff completed the presentation of the seminar without incident and there was no discussion of the comments made. (Pl.'s Dep. at 144-45.)
7. The next morning on May 29, 1992, plaintiff called Salvato to discuss the comments that were made at the seminar. (Pl.'s Dep. at 167-68.) According to plaintiff, Salvato said she did not want plaintiff to inform the Wausau home office unless plaintiff could do it through the back door without names because Salvato had to rely on the managers in Kansas City. (Pl.'s Dep., Vol. I, at 182-83.) Salvato told plaintiff that it was necessary that Salvato stay out of the situation. (Id. at 184.)
8. That same day, on May 29, 1992, Bosshard met with plaintiff in his office to discuss affirmative action programs for Wausau. (Bosshard Dep. at 289-290; Pl.'s Dep., Vol. I, at 195.) Under Wausau's sexual harassment policy, Bosshard was the person initially responsible for implementing the investigation and remedial process of complaints of sexual harassment. (Defs.' Exh. BB.) Plaintiff told Bosshard that she was upset with the way that he handled the questions raised by Keith Affield during the seminar. (Bosshard Dep. at 290.) Bosshard stated that he did not hear the comments and plaintiff informed him of the comments made by Affield and Getting. (Bosshard Dep. at 290-91.) Bosshard said it was a Salvato problem and that he needed to apologize to Salvato. (Pl.'s Dep., Vol. I, at 196.) At least three times during the conversation, plaintiff told Bosshard that it was a "Mastio problem not a Salvato problem" and she pounded on the table. (Pl.'s Dep., Vol. I, at 196-99.) Plaintiff stated that it was her problem because she was not living up to her obligation with the company to act promptly when sexual harassment was mentioned and because she took the comments personally because she was a woman. (Pl.'s Dep., Vol. I, at 197.) Plaintiff stated that she could not get Bosshard to understand that Salvato did not want to get involved or have any action taken. (Pl.'s Dep., Vol. I, at 196.) Plaintiff thought that Bosshard discounted the incident. He stated that he would apologize to Salvato. (Pl.'s Dep., Vol. I, at 195-96.)
9. During this meeting, Bosshard stated that he was sorry and admitted that he had statements to Marilyn Salvato along the same line. (Bosshard Dep. at 291-292.) Bosshard stated that he made the comment in jest and apologized. (Bosshard Dep. at 292.) At the meeting, Bosshard asked plaintiff what she wanted him to do about the situation, and she stated that he was her supervisor and she could not tell him what to do and that he should know what to do after thirty years in personnel. (Pl.'s Dep., Vol. I, at 199.) During this conversation, John Bosshard got his lunch, put it on the table and stated "see, this is what kind of lunch you get when your wife works." (Pl.'s Dep., Vol. I, at 199-200.)
10. That same day, on May 29, 1992, Bosshard spoke with Greg Getting about the May 28 seminar, and Getting indicated that he did not recall making the statement. *1402 (Bosshard Dep. at 154-157.) Bosshard also told Affield that plaintiff was upset with the comment made in the May 28 seminar. (Bosshard Dep. at 159-163.)
11. On June 1, 1992, Bosshard spoke with Marilyn Salvato about the events that occurred during the seminar. (Bosshard Dep. at 167-168.) Subsequently, plaintiff stated that Salvato told plaintiff that John Bosshard had approached her and apologized to her about the remarks made at the seminar. (Pl.'s Dep., Vol. I, at 185.)
12. Plaintiff then contacted Cindi Jacobs, a Wausau trainer and told her of the incident at the May 28 seminar and asked her to keep the call confidential. Later in the conversation, Jacobs told plaintiff that she could not keep the call confidential because it concerned a complaint of sexual harassment. (Pl.'s Dep., Vol. I, at 207 and 210.) Cindi Jacobs suggested to plaintiff that she write the three managers a letter telling them that these kinds of remarks would not be tolerated in any future seminars. (Pl.'s Dep., Vol. I, at 211.) On June 10, 1992, plaintiff wrote a memo to Keith Affield, Greg Getting, and John Bosshard, asking them not to make discriminatory remarks during future seminars. (Pl.'s Dep., Vol. I, at 226-227; Pl.'s Exh. 9.)
13. After plaintiff sent the memo, none of the individuals made any discriminatory remarks of a sexual nature. (Pl.'s Dep., Vol. I, at 226-227.) Plaintiff received a written response from Keith Affield asking what comments he made at the seminar that she considered discriminatory. (Pl.'s Dep., Vol. I, at 227-228.) Plaintiff spoke to Keith Affield on the telephone and discussed the comments made at the seminar. (Pl.'s Dep., Vol. I, at 228-229.) Although plaintiff cannot recall the specific conversation, she felt it ended on a pleasant note and both had learned the need to be very careful about what they say. (Pl.'s Dep., Vol. I, at 228-229.) In plaintiff's mind, after her conversation with Keith Affield, the situation with Keith Affield and the May 28 seminar had been resolved. (Pl.'s Dep., Vol. I, at 229.) Plaintiff had no further conversations with Keith Affield about the May 28 incident. (Pl.'s Dep., Vol. I, at 229.) Greg Getting called plaintiff immediately after receiving the memo and indicated that, if she said he made inappropriate statements, he believed her and he was sorry. (Pl.'s Dep., Vol. I, at 229-230.) Greg Getting never said anything to the plaintiff after the May 28, 1992, incident that was sexually discriminatory or harassing. (Pl.'s Dep., Vol. II, at 60.)
14. From May 29, 1992, until April 30, 1993, plaintiff's last day at Wausau, there were no comments made by any employees of Wausau to plaintiff that were sexually harassing or discriminatory in nature or were discriminatory in nature regarding any disability plaintiff may have had. (Pl.'s Dep., Vol. III, at 131.)
15. Following Jacobs' conversation with plaintiff about the May 28 incident, Jacobs reported the incident to Jacobs' supervisor, Bob Barrett. (Lucas Dep. at 33.) During the first or second week of June 1992, Barrett reported it to Roger Lucas, the director of field human resources, by telephone. (Lucas Dep. at 32-33.) Barrett stated that an incident had taken place in the Kansas City office and that he should contact Cindi Jacobs for more information. (Lucas Dep. at 33.) Lucas then called Jacobs to ask her about the incident, and she told him plaintiff had called her and stated that she was very upset about statements that were made in a training session with the management team in Kansas City. (Lucas Dep. at 35-36, 38; Pl.'s Dep., Vol. I, at 207, 210.)
16. That day or the following day, Lucas called plaintiff because he regarded the incident as a serious matter. (Lucas Dep. at 37-38; Pl.'s Dep. Vol. II, at 17.) Lucas' notes of his conversations with Jacobs and plaintiff are collectively marked as Exhibit D. (Lucas' Dep. at 44.) In that conversation with plaintiff, Lucas assured plaintiff that there would be no repercussions, and asked her what had transpired. (Lucas Dep. at 38.) Plaintiff initially expressed concern not only about the statements in the training session, but was concerned about repercussions to John Bosshard or anyone else in that office. (Lucas Dep. at 39.) Plaintiff then told Lucas that at a motivational training session Affield indicated that you have to manage men differently than women, Salvato then indicated *1403 that she managed men and women and did not know what he was referring to, then John Bosshard stated "what's there to manage. Women don't work anyway," to which Greg Getting made a remark echoing Bosshard's statement. (Lucas Dep. at 40.) Plaintiff stated that she told Bosshard in a subsequent meeting on May 29 that she believed that the remarks in the session were inappropriate, and that Bosshard was not supportive of her. (Lucas Dep. at 64-65.)
17. That day or the next day, after Lucas' conversation with plaintiff, Lucas talked to Bill Tolly, assistant vice president of field administrative services, about the incident. (Lucas Dep. at 46; Tolly Dep. at 44-47, 58-59.) Lucas reviewed his notes with Tolly and then developed an action plan. The plan was that Tolly would talk with Marilyn Salvato about the incident because Tolly had known Salvato for years and he would talk with John Bosshard. (Lucas Dep. at 47-48; Tolly Dep. at 49-53, 63-64.) Tolly wanted to find out whether this was a common practice or an isolated incident. (Tolly Dep. at 68.) Tolly thought that it was important to talk to Salvato because she was a female manager who was in the Kansas City office every day, whereas plaintiff was an infrequent visitor. (Tolly Dep. at 69-70.) Tolly also believed that this was a serious matter because some male managers had made comments that made a female manager upset. (Tolly Dep. at 60.) Tolly decided that he would personally talk to plaintiff about the incident. (Tolly Dep. at 70-71.) Tolly called the plaintiff and said that he was going to investigate the situation. (Pl.'s Dep., Vol. II, at 17; Defs.' Exh. E.)
18. In a telephone conversation, Salvato told Tolly that at a training session in Kansas City, Affield indicated that you can not manage females, she did not hear what Bosshard had said, and that Greg Getting stated that "I don't think women even work." (Tolly Dep. at 74, 79, and 82.) Salvato told Tolly that she was not offended by these comments. (Tolly Dep. at 121.) Salvato did not state that these managers had made these types of comments before. (Tolly Dep. at 112-113.)
19. On June 22 or 23, 1992, Bosshard returned from vacation and found in his mail a memorandum from plaintiff concerning the May 28 seminar. (Bosshard Dep. at 144; Defs.' Exh. C). Two weeks after plaintiff sent the memo to John Bosshard, Keith Affield, and Greg Getting, she received a call from John Bosshard stating that he had been on vacation and that he was sorry he had not responded to her memo. (Pl.'s Dep., Vol. I, at 232-234.)
20. On June 22, 1992, Lucas and Tolly talked with Bosshard by telephone. (Lucas Dep. at 55 and 56; Defs.' Exh. D; Tolly Dep. at 98; Bosshard Dep. at 144.) Bosshard admits that he had made a statement to the effect of "do any females work here?" (Tolly Dep. at 105; Bosshard Dep. at 146-147.) Bosshard reported that Greg Getting stated at the session that he was "not aware of any women that work around here," although Bosshard did not actually hear the comment, and it was reported to him by plaintiff on May 29, 1992. (Lucas Dep. at 52; Tolly Dep. at 103 and 105; Bosshard Dep. at 153-154.) Bosshard told Tolly that he had not intended to offend anyone, but that he was genuinely sorry that he had participated in the conversation. (Tolly Dep. at 108.) Tolly told Bosshard that he needed to apologize to plaintiff. (Tolly Dep. at 110-111; Bosshard Dep. at 149 and 229; Lucas Dep. at 67.) Tolly and Lucas also told Bosshard that Bosshard needed to talk with Earl Helvick, the regional vice president, about what had transpired, and Bosshard was to talk with the other managers to tell them that those remarks were inappropriate. (Lucas Dep. at 55, 67; Tolly Dep. at 88 and 110-111; Bosshard Dep. at 149.) Tolly told Bosshard that he wanted Earl Helvick to call him. (Bosshard Dep. at 229.)
21. After he finished with his conversation with Tolly and Lucas, Bosshard received a telephone call from plaintiff on the morning of June 22. (Bosshard Dep. at 198.) In that conversation, plaintiff told Bosshard that she was an honest person and that she did not want him to be blind-sided since she had previously talked to Tolly about the May 28 incident. (Bosshard Dep. at 198-199; Defs.' Exh. F.) During the conversation, plaintiff *1404 mentioned that she had talked to Ari Schmidt, a counselor with Wausau's employee assistance program, and that she was depressed. (Bosshard Dep. at 201-202.) Plaintiff was upset with Bosshard because she had heard from Getting and Affield in response to her letter of June 10, but had not heard from Bosshard. (Bosshard Dep. at 219.) Plaintiff stated that she was shocked to hear from Roger Lucas, and thought her complaint may be political suicide. (Bosshard Dep. at 221-222.)
22. After Tolly and Lucas had spoken with Bosshard, Lucas called plaintiff to tell her that they had spoken with Bosshard and he was very sorry for his comment, and would be following up with her with an apology; that Earl Helvick would be made aware of the situation; that the other managers would be informed that comments of that nature were not acceptable; and that there would be no repercussions against her. (Lucas Dep. at 61-62.) Plaintiff believes Roger Lucas communicated a message from Tolly that John Bosshard was sorry about the incident and to put the incident in the past. (Pl.'s Dep., Vol. II, at 111.) Lucas spoke with Bosshard for a second time the latter part of the week of June 22. (Lucas Dep. at 56.)
23. Bosshard talked to Helvick on the same day he talked to Tolly. (Bosshard Dep. at 132-137, 143, 150.) Bosshard told him about the May 28 session. (Bosshard Dep. at 152.) Bosshard then informed Helvick about the plan of action that was set out by Tolly. (Bosshard Dep. at 171.)
24. After Bosshard's meeting with Helvick, Bosshard spoke with Getting on June 22 or 23 in Getting's office about plaintiff's complaint. (Bosshard Dep. at 158-159.) Bosshard indicated that they would have to be more businesslike, and there was to be no retaliation. (Bosshard Dep. at 158.) Bosshard then met with Affield on June 22 or 23 in which he repeated the same topics. (Bosshard Dep. at 159, 165-166.)
25. Later in the week of June 22, 1992, Tolly called Bosshard and Bosshard stated that he had apologized to plaintiff, and then he read to Tolly the draft letter of apology to plaintiff. (Tolly Dep. at 124; Bosshard Dep. at 238.) Bosshard told Tolly that he had spoken with the other managers to let them know that their remarks were inappropriate and should not occur again. (Tolly Dep. at 90-91.) On June 23, 1992, Bosshard sent plaintiff a note of apology. (Bosshard Dep. at 237; Pl.'s Dep., Vol. II, at 5; Defs.' Exh. C.)
26. Tolly spoke with Helvick about the May 28 incident after Bosshard had spoken with Helvick. (Tolly Dep. at 91; Lucas Dep. at 60, 126.) Tolly discussed the incident with Helvick, and how John Bosshard had made him aware of the situation. (Tolly Dep. at 127.) Helvick also related that John Bosshard had talked to the managers and apologized to plaintiff. (Tolly Dep. at 127.)
27. Lucas thought that the reprimand to the managers that such comments would not be condoned and informing their supervisor, Earl Helvick, was sufficient to stop the conduct from occurring again. (Lucas Dep. at 68.) However, the investigation was not complete until Tolly had talked with Helvick to insure that he was apprised and that Bosshard had followed through with the instructions that he had been given by Lucas and Tolly, and John Bosshard talked to the managers about the incident, and Bosshard had made a formal apology. (Tolly Dep. at 90-91.) Other than orally reprimanding the managers and telling them that such comments would not be condoned, there was no other disciplinary action taken. (Lucas Dep. at 68; Tolly Dep. at 117-118, 208-213.) The company had gathered enough evidence to support plaintiff's allegations that the remarks had been made in the May 28 seminar. (Tolly Dep. at 210.) However, the company determined that the incident was not a pattern of behavior but a "one incident situation." (Tolly Dep. at 118.)
28. On a date not revealed in the record, Bosshard received a report that E.J. Stark, a manager in St. Louis, had made an analogy between the size of an office and a part of Earl Helvick's anatomy. Helvick was regional vice president. Stark made the comment about Helvick to Mark Rudoff. No one else was present. Bosshard went to St. Louis and spoke to Stark, telling Stark that *1405 it was disrespectful to make such a comment about a vice president. Stark was orally reprimanded. (Bosshard Dep. at 121-124; Stark Dep. at 221-230.)[2]
29. In another incident, around June 1992, plaintiff received a complaint from another employee that E.J. Stark had referred to clerical jobs as "skirt work" and that he did not like fat women. (Pl.'s Dep., Vol. I, at 71-72.) Stark did not direct any comments to plaintiff nor did he make any in her presence. (Pl.'s Dep., Vol. I, at 72.) Bosshard orally reprimanded Stark. (Pl.'s Dep., Vol. I, at 81.) Several days later, Tolly called plaintiff and told her that he was going to talk with Stark about the inappropriate remarks that Stark had been making. He then got Stark on the telephone with plaintiff and Tolly and told him to stop making these kinds of comments. (Pl.'s Dep., Vol. I, at 87-88.) With Stark still on the phone, Tolly told plaintiff to monitor the situation and report to Tolly immediately if any more comments were made. (Pl.'s Dep., Vol. I, at 88.) After that, plaintiff did not receive any more complaints from women about Stark making inappropriate remarks of a sexual nature. (Pl.'s Dep., Vol. I, at 90.)
30. Toward the end of June 1992, plaintiff felt that Getting was intimidating her because she was being implicated against her will in the firing of Carol Waterman, an employee in the Kansas City office. Plaintiff did not hear Getting say anything discriminatory during this process. (Pl.'s Dep., Vol. II, at 58-60.) Getting testified that he went to plaintiff concerning Waterman because plaintiff had knowledge about Waterman and because he had often sought plaintiff's advice over the years. (Getting Dep. at 28-31, 76-77.) Plaintiff informed Waterman that she thought Getting was treating her unfairly. (Pl.'s Dep., Vol. II, at 70.) When Waterman informed plaintiff that she had filed an EEOC charge, plaintiff told Waterman that she would support her. (Pl.'s Dep., Vol. II, at 72.) Plaintiff told Bosshard that Waterman had filed an EEOC complaint. (Pl.'s Dep., Vol. II, at 71.)
31. In July 1992, about one month after Bosshard had returned from his vacation, Ari Schmidt, a counselor for the employee assistance program at Wausau, notified Bosshard that plaintiff was taking some time off work and was under the care of a doctor. (Bosshard Dep. at 175-177; Defs.' Exh. H.) Plaintiff testified that she notified Bosshard that she was taking time off in July 1992, at a doctor's recommendation, and Bosshard asked plaintiff to provide a note and Bosshard did not ask her the reasons. (Pl.'s Dep., Vol. II, at 150-151; Defs.' Exh. H.) The policy at Wausau for taking time off work was to have a doctor's certificate if the employee was going to be absent more than five days. (Bosshard Dep. at 178.)
32. On July 17, 1992, plaintiff wrote to Bosshard, asking him to remove her from her training responsibilities in the Kansas City office and her involvement in any future regional training planning. In the memo, she stated that after the incident during the May 28, 1992, workshop, she was emotionally traumatized to the point where she realized that she was no longer capable of presenting any workshops in the Kansas City office. She stated that she had also learned that other employees not involved in the incident had learned about it and that, therefore, she believed her effectiveness in employee training in Kansas City was diminished. (Pl.'s Exh. 10; Pl.'s Dep., Vol. II, at 98-99, 108, 146.)
33. On July 20, 1992, Schmidt informed Susan Leonard, Wausau's attorney, that plaintiff was attributing the onset of her symptoms to the May 28, 1992, incident. (Pl.'s Exh. 13 at W0002623.)
34. In an E-mail message dated July 21, 1992, to Bosshard, plaintiff stated that she was frightened about her mental stability. She stated that she was terrified at the thought of going to work and was shaking throughout the day. "The most important aspect of my world, my job, is out of control now." She stated that she needed Bosshard's decision on removing her training responsibilities so that she could have "some *1406 time to deal with it so I can perhaps put some order back into my life." (Pl.'s Exh. 11.) Bosshard approved her request. (Bosshard Dep. at 257.)
35. Following the May 28, 1992, incident, plaintiff was in frequent contact with Ari Schmidt, Wausau's employee assistance program manager, concerning the effect this incident had on her life. (Pl.'s Exh. 13.)
36. Plaintiff began seeing a psychiatrist and on July 22, 1992, Georgia Jones, M.D., wrote that plaintiff, due to medical reasons, must be off work effective July 22, 1992, and that she may return to work on July 30, 1992. (Pl.'s Exh. 12; Pl.'s Dep., Vol. II, at 178-79.)
37. In October and November 1992, plaintiff had heard some discussion about the possibility of company reorganization and that many people were fearful for their jobs. (Pl.'s Dep., Vol. II, at 174-175.) A planning group had started discussing the formation of the South Central Region in the summer of 1992. (Tolly Dep. at 41-42.) Plaintiff did not make any independent inquiries to determine what was to occur regarding the reorganization. (Pl.'s Dep., Vol. II, at 176.) In November 1992, plaintiff first learned that the Nationwide employees within the Central Division were going to become Wausau employees, effective January 1, 1993. (Pl.'s Dep., Vol. I, at 105-106.)
38. In early November 1992, Getting was in the St. Louis office. He met with Michael Swit, a manager in the St. Louis office, about not having the same job after restructuring. Swit reported to plaintiff that Getting said this based on the fact that Swit would be physically unable to handle the additional responsibilities placed on a field sales manager. (Pl.'s Dep., Vol. II, at 85.) Swit told plaintiff that he was filing an EEOC charge. (Pl.'s Dep., Vol. II, at 88.)
39. On November 17, 1992, Cecil Mayo visited the St. Louis office and told plaintiff that she may not have a job after the reorganization. (Pl.'s Dep., Vol. II, at 179, 185-186.)
40. On December 15, 1992, plaintiff wrote to John Bosshard in an e-mail message that she needed to take off December 23, 1992, as a personal day because she was "going through an extremely difficult emotional problem ... far more difficult than I could ever imagine." She told Bosshard that she had been seeing Dr. Jones since early October and was diagnosed at that time as being in clinical depression. (Defs.' Exh. O.) Bosshard approved her request. (Id.)
41. On December 16, 1992, Schmidt called plaintiff and told her that Bosshard had called Schmidt on December 15, 1992, concerned about plaintiff's mood; Bosshard told Schmidt that plaintiff had informed him that she was clinically depressed. (Pl.'s Exh. 13 at W0002621.) Schmidt's notes indicate that plaintiff had considered committing suicide. (Pl.'s Exh. 13 at W0002620.)
42. On December 22 or 23, 1992, plaintiff, in a conference call with John Bosshard and Susan Wailes, was informed of a new organizational chart. (Pl.'s Dep., Vol. III, at 31-32; Affidavit of Francis Dusenbury, ¶ 5 and Defs.' Exh. P.) Plaintiff was informed that she would no longer be reporting to John Bosshard but to Susan Wailes in Kansas City, but they were unable to tell plaintiff what her duties would be. (Pl.'s Dep., Vol. III, at 32.) Plaintiff was told that Susan Wailes and Francis Dusenbury would get back to plaintiff regarding her duties. (Pl.'s Dep., Vol. III, at 32.) From the conversation, plaintiff believed that she would no longer have any human resource functions, no office managerial functions, and would not be on the training cadre any longer. (Pl.'s Dep., Vol. III, at 37.)
43. On December 22, 1992, Georgia Jones, M.D., wrote that plaintiff was on medical leave until January 11, 1993. Her diagnosis was post-traumatic stress disorder. (Defs.' Exh. Q.) On January 6, 1993, Dr. Jones asked that plaintiff's medical leave be extended until January 25, 1993. (Pl.'s Exh. 12 at W0002629.) Ari Schmidt informed Bosshard of plaintiff's leaves of absence but he did not share with Bosshard what was occurring with plaintiff with respect to these absences. (Bosshard Dep. at 178-179, 253.) On December 22, 1992, Schmidt told Leonard, Wausau's attorney, that plaintiff had told Bosshard of her diagnosis. Schmidt was concerned that this put management on notice. (Pl.'s Exh. 13 at W0002618.)
*1407 44. On December 23, 1992, plaintiff drafted the declaration that she filed with the EEOC in her charge of discrimination. (Defs.' Exh. G.)
45. Near the end of 1992 or early 1993, Cecil Mayo decided to eliminate the human resources function in St. Louis. (Tolly Dep. at 157-158; Mayo Dep., Vol. II, at 159.) The decision was primarily made by Cecil Mayo and his supervisor, Dave Jahn, after the consideration of a number of factors. (Mayo Dep., Vol. I, at 104-105; Vol. II at 159.) The factors that influenced Mayo's decision included the number of employees, the type of things that the person would be doing for those employees and whether some of those functions could be centralized, and what training or counseling may be needed in that office. (Mayo Dep., Vol. I, at 104-105.) The reason given for the elimination of the human resources function in St. Louis was that "there would not be enough HR duties and responsibilities remaining after the breakout to warrant an HR presence there [St. Louis]." (Mayo Dep., Vol. II, at 164.) After the reorganization, the only human resource functions that would remain in St. Louis after the other duties were allocated to other departments would be some counseling, some hiring, some training, and some benefits consultation. (Mayo Dep., Vol. II, at 163-164.) The clerical and general processing functions, previously done by the human resource managers, were centralized in San Antonio. (Mayo Dep., Vol. II, at 164-165). The human resource functions in St. Louis would be assumed by the Kansas City Human Resources Manager, John Bosshard. (Mayo Dep., Vol. II, at 164-165; Tolly Dep. at 158; Dusenbury Affidavit, ¶ 5.) Plaintiff was transferred to the office services department as a result of the reorganization. (Tolly Dep. at 225.) Debbie Dziuwiec, an assistant to Bosshard in Kansas City, previously assisted in the human resources and office services functions in Kansas City, but it was decided in December 1992 that Dziuwiec's human resources functions were to be removed in the reorganization. (Bosshard Dep. at 68-72, 78.)
46. Effective January 1, 1993, plaintiff was assigned to the commercial services department. She was to report to Sue Wailes in Kansas City. (Dusenbury Affidavit at ¶ 5.) In her position in the commercial services department in the St. Louis office, plaintiff was not to be responsible for human resources functions but rather she was to supervise three employees in the St. Louis office: Mattie Williams, a records processor, and Anna Gaehle and Faye George, word processing operators. (Dusenbury Affidavit at ¶¶ 5 and 6.)
47. In January 1993, Bosshard learned that plaintiff had filed a charge of discrimination with the EEOC. (Bosshard Dep. at 184.)
48. On January 4, 1993, Mayo spoke with Bosshard about plaintiff. Mayo's notes of that conversation indicate that the doctor had advised that plaintiff remain off until January 11, 1993, and that plaintiff had been in contact with Schmidt in EAP for depression, anxiety and emotional problems but that Schmidt would not share details. Mayo's notes also indicate that plaintiff had taken Christmas early because of a family situation, that plaintiff was "off after incident  less than 10 days," that she had marital and parenting problems that took their toll, that she had problems with her back, and that there was a problem with training. (Pl.'s Exh. 18; Mayo Dep. at 255-260.)
49. On January 25, 1993, Bosshard asked Cecil Mayo and Francis Dusenbury if plaintiff could have some human resources responsibility in St. Louis; however, Mayo advised Bosshard that plaintiff had been assigned to office services and Mayo would no longer be involved with her job duties, and her responsibilities would be the responsibility of Dusenbury. (Bosshard Dep. at 243-247.) Dusenbury also telephoned Bosshard and told him that plaintiff would serve in a function of office administration, and indicated that she would be at a meeting in San Antonio. (Bosshard Dep. at 301-309.) Toward the end of January 1993, plaintiff was informed that there would be no human resources function in St. Louis. (Pl.'s Exh. 14.)
50. On January 26, 1993, Cecil Mayo asked plaintiff if she would be interested in a human resources position in Houston. (Pl.'s Dep., Vol. III, at 46-47, 49.) On January 28 *1408 or 29, 1993, Mayo asked Bosshard whether plaintiff was available as a candidate for the Houston human resources position and whether she was willing to relocate. (Bosshard Dep. at 251.) Lucas provided the names of plaintiff and Jim Bock as candidates for the Houston human resources position. (Lucas Dep. at 88-90.) Mayo was also considering an internal candidate, Belen Segovia, in San Antonio for the Houston position. (Lucas Dep. at 91.) After review of the files of potential candidates for the Houston position, Mayo interviewed three individuals: Jim Bock, the plaintiff, and Belen Segovia. (Mayo Dep., Vol. II, at 245.)
51. When Mayo was considering plaintiff as a candidate for the Houston position, Mayo talked to E.J. Stark about plaintiff. (Pl.'s Exh. 19; Mayo Dep. at 261, 264.) Most of Stark's comments were negative and included comments such as "out of office quite a bit for back prob; stress" and "not uncommon to take couple day a wk; no one to police;" "very emotional; over reacts; if personal crisis" (Pl.'s Exh. 18.)
52. On February 4, 1993, plaintiff interviewed with Cecil Mayo in San Antonio, Texas. (Pl.'s Dep., Vol. III, at 86.) Plaintiff indicated that she felt very good about the interview and there was nothing inappropriate about it. (Pl.'s Dep., Vol. III, at 91.) There were no discussions at the interview about any illness or psychological treatment plaintiff may have had. (Pl.'s Dep., Vol. III, at 91.) Mayo said he did not consider any illness or emotional situation of plaintiff in making his decision on the Houston human resources position. (Mayo Dep., Vol. II, at 261-262.) At the time of his interview with plaintiff, Mayo knew, from discussions with Tolly, about the May 28, 1992, incident in Kansas City. (Tolly Dep. at 176-77.) At the time Tolly spoke with Mayo, Tolly did not inform Mayo about any other complaints or grievances involving any other person in the South Central Division. (Tolly Dep. at 178-81.) At the time of the interview, Mayo also knew, based on a conversation with Bosshard, that plaintiff had been having emotional problems, had been in contact with Ari Schmidt of the EAP program and had been involved "from an EEO standpoint." (Mayo Dep. at 214-16.)
53. On February 8, 1993, Sue Wailes and Francis Dusenbury, then director of commercial services for the south central division of Wausau Service Corporation, went to St. Louis to discuss with the plaintiff her duties associated with her position with commercial services. The meeting was arranged because plaintiff had inquired about her duties and questioned whether she would be involved in human resources functions. (Dusenbury Affidavit at ¶¶ 3, 7, 8.) At the meeting, plaintiff stated that, prior to her transfer to commercial services on January 1, 1993, sixty five percent of her work concerned human resource duties and thirty percent concerned office services, including word processing records, office renovation and equipment and furniture responsibilities, mail room, and the receptionist. (Dusenbury Affidavit at ¶ 8). In plaintiff's position with commercial services, she would not have responsibility for equipment, furniture, renovation, mail room and the receptionist because these duties would be assumed by individuals in the Kansas City office and the Wausau home office, and plaintiff was notified of this decision on February 26, 1993. (Dusenbury Affidavit at ¶ 8.) The work that was done by plaintiff in St. Louis was taken over by two existing Kansas City employees: Debbie Dziuwiec took over responsibility for the mail room and receptionist, and Sue Wailes took over word processing. (Bosshard Dep. at 107-108.)
54. About 10 days after plaintiff's interview for the Houston position, plaintiff was informed that she did not get the job. (Pl.'s Dep., Vol. III, at 94.) She indicated that Cecil Mayo stated that he had spoken with people in the home office and in San Antonio and there were "circumstances" involved and so they decided to go with another person. (Pl.'s Dep., Vol. III, at 95.) Cecil Mayo stated that during his consideration of the plaintiff for the Houston position, he learned that plaintiff had filed an EEOC charge concerning comments that had been made at the May 28, 1992, seminar. (Mayo Dep., Vol. II, at 222-225.) However, it was his understanding that it had to do with a matter that *1409 occurred before the consolidation and it had been investigated and resolved. (Mayo Dep., Vol. II, at 221.) Bosshard advised Mayo of the charge only on a need to know basis since it was a matter in the division in which Mayo was now the head of human resources for the South Central Division. (Bosshard Dep. at 185-186.) Bosshard also advised that plaintiff was being removed as a trainer. (Bosshard Dep. at 256-257.)
55. Belen Segovia, a Hispanic female, was selected for the Houston position because Mayo felt she was the best qualified. (Mayo Dep., Vol. II, at 241 and 245.) Mayo based his decision on a number of factors, including work experience, educational background, experience and knowledge of other departments within the organization, ambition, and willingness to accept tough assignments. (Mayo Dep., Vol. II, at 245-246.) Mayo indicated to Lucas that Mayo and Segovia's philosophy matched on human resource issues, she had good supervisory experience, Mayo had previously worked with her, and she has some human resources experience. (Lucas Dep. at 92.) Mayo made the selection for the Houston human resources position. (Tolly Dep. at 189-191.)
56. After Dusenbury and Sue Wailes reviewed the duties and responsibilities left to the plaintiff after the formation of the south central division, they decided to eliminate plaintiff's position because plaintiff's remaining functions of supervising the three clerical positions could be done by Susan Wailes in Kansas City. (Dusenbury Affidavit at ¶ 9.) Dusenbury felt there was no business justification for having plaintiff's position with commercial services in the St. Louis office. (Dusenbury Affidavit at ¶¶ 9 and 10.) Plaintiff agreed with this assessment, that it would not make good business sense to retain her in her position in St. Louis. (Pl.'s Dep., Vol. III, at 217-218.) On February 26, 1993, plaintiff was informed by Susan Wailes, in person at the St. Louis office, that plaintiff's position had been eliminated and that she had sixty days to use the facilities to find another job. (Pl.'s Dep., Vol. III, at 126-127; Dusenbury Affidavit at ¶ 9.)
57. Before Mayo and Wailes arrived on February 26, 1993, plaintiff had surmised that she was going to be terminated because of the timing of their visit and because she had not heard from Wailes or Dusenbury about her duties. (Pl.'s Depo., Vol. III, at 124-126.) Therefore, plaintiff had cleaned out her office of personal things, made sure the files were in order and the managers knew where to find things, and had her keys ready to turn in. (Pl.'s Dep., Vol. III, at 126-127.) Plaintiff decided she would take early retirement after her position was eliminated. (Pl.'s Dep., Vol. III, at 129.)
58. Bosshard notified Lucas of the elimination of plaintiff's position in order to assist her in finding another position. (Bosshard Dep. at 313-314.) Lucas explored employment possibilities for plaintiff with Nationwide Insurance by sending on plaintiff's last one or two performance appraisals, her salary, educational experience, and performance memos. (Lucas Dep. at 121-122; Defs.' Exhs. Z, AA).
59. From December 1992 until plaintiff left Wausau at the end of April 1993, there were no changes in plaintiff's salary, wages or benefits. (Pl.'s Dep., Vol. III, at 66-67.) No one was hired to replace plaintiff in the St. Louis office. (Pl.'s Dep., Vol. III, at 109.) After plaintiff left the company, the human resources function was taken over by John Bosshard, and his replacement after retirement, Kathy Click. (Bosshard Dep. at 108-109; Dusenbury Affidavit at ¶ 5.) Some of the salary information was taken over by the existing managers in St. Louis. (Bosshard Dep. at 109.)
60. While employed by defendant, plaintiff performed her duties well and was regarded as very effective. (Pl.'s Exh. 3.) In 1986, 1988 and 1991, the last three performance appraisals she had before she was terminated, Bosshard rated plaintiff's performance as outstanding, the highest possible rating plaintiff could receive. (Pl.'s Exhs. 4, 5, 6.) Plaintiff's personnel records show that she was an employee who sought out and took on additional duties and responsibilities. She was technically proficient and respected for this technical knowledge. (Pl.'s Exhs. 3-8.)

*1410 DISCUSSION

This Court must grant summary judgment if, based upon the pleadings, admissions, depositions and affidavits, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corporation v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Board of Education, Island Trees Union Free School District No. 26, v. Pico, 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). The moving party must initially demonstrate the absence of an issue for trial. Celotex Corporation, 477 U.S. at 323, 106 S.Ct. at 2552-53. Any doubt as to the existence of a material fact must be resolved in favor of the party opposing the motion. Board of Education, Island Trees, 457 U.S. at 863, 102 S.Ct. at 2806. Nevertheless, once a motion is properly made and supported, the non-moving party may not rest upon the allegations in his pleadings but must instead set forth specific facts showing that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e); Buford v. Tremayne, 747 F.2d 445, 447 (8th Cir.1984). Summary judgment must be granted to the movant if, after adequate time for discovery, the non-moving party fails to produce any proof to establish an element essential to the party's case and upon which the party will bear the burden of proof at trial. Celotex Corporation, 477 U.S. at 322-24, 106 S.Ct. at 2552-53.

Sexual harassment claim
Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination based on sex which has created a hostile or abusive working environment violates Title VII. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); 42 U.S.C. § 2000e-2(a)(1). To establish a Title VII hostile work environment action on the basis of sex, the plaintiff must show that (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1377 (8th Cir.1996).
Plaintiff must show a practice or pattern of harassment against her; a single incident or isolated incidents are generally insufficient. Clayton v. White Hall School District, 875 F.2d 676, 680 (8th Cir.1989). Sexual harassment in a hostile environment requires plaintiff to show "sustained and nontrivial" acts. Moylan v. Maries County, 792 F.2d 746, 749-50 (8th Cir.1986). The court must look at the totality of the circumstances to determine whether sexual harassment at the work place is sufficiently severe and persistent. Id. at 750. Factors to be considered include the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 22-24, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993). The effect on the employee's psychological well-being is relevant but not the determinant factor as to whether the plaintiff found the environment abusive. Id.
To affect a "term, condition, or privilege" of employment within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive `to alter the conditions of [the victim's] employment and create an abusive working environment.'" Meritor, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)). While a single, isolated incident of sexual harassment generally is not sufficient to state a claim of hostile work environment sexual harassment, Moylan, 792 F.2d at 749, certain severe isolated incidents of harassment have been found to support such a claim. See Guess v. Bethlehem Steel Corp., 913 F.2d 463, 464 (7th Cir. 1990) (plaintiff picked up by a foreman who forced her face into his crotch); Barrett v. Omaha National Bank, 726 F.2d 424, 426 (8th Cir.1984) (plaintiff complained that a coworker *1411 talked to her about sexual activity and touched her in an offensive manner on the way to and during a two-day conference). Allegations that co-workers have been sexually harassed may be considered to determine whether a hostile work environment exists. Hall v. Gus Construction Co., Inc., 842 F.2d 1010, 1014-15 (8th Cir.1988).
Defendants argue that they are entitled to summary judgment on plaintiff's sexual harassment claims because (1) plaintiff has no evidence that the harassment was sufficiently severe or pervasive and (2) there is no evidence that defendants failed to take prompt and remedial measures upon learning of the alleged sexual harassment.
Even accepting plaintiff's allegations as true, the comments are insufficient as a matter of law to support a claim of sexual harassment. The comments were sporadic. Plaintiff alleges that Bosshard made a statement in July 1991 that "women do not belong in the business world." Nearly a year later on May 28, 1992, the managers made the comments during the seminar, which was an isolated occurrence in the context of a discussion about meeting the needs of employees. The next day, May 29, 1992, Bosshard said "this is the kind of lunch you get when your wife works." The other two comments allegedly made by E.J. Stark were not directed to plaintiff nor made in her presence. There is no evidence plaintiff even knew about the comment Stark made about Helvick; the other comment was reported to plaintiff. Plaintiff also alleges that Getting referred to another female employee as a "bitch" during a conversation between plaintiff and Getting. The comments were offensive, but not physically threatening.
Although plaintiff attributes the onset of her mental problems to the comments made in the May 28, 1992, the court concludes that plaintiff's working environment could not reasonably be perceived as hostile or abusive. Harris, 510 U.S. at 20-24, 114 S.Ct. at 370-71. These comments fall short of the kind of sustained harassment that the Eighth Circuit has found to be a proper foundation for sustaining a hostile environment cause of action. See e.g., Kopp v. Samaritan Health System, Inc., 13 F.3d 264, 269 (8th Cir.1993) (doctor repeatedly swore at female nurses and assistants, calling them abusive names, threatening and on occasion physically harming them); Burns v. McGregor Electronic Industries, Inc., 955 F.2d 559, 560-562 (8th Cir.1992) (describing a consistent course of insulting and debasing conduct); Ways v. City of Lincoln, 871 F.2d 750, 753-55 (8th Cir.1989) (finding pervasive some 50 examples of racial harassment that included jokes, comments and actions inflicted upon plaintiff during his 17-year career). Cf. Callanan v. Runyan, 903 F.Supp. 1285, 1297-98 (D.Minn. 1994) (granting summary judgment on hostile environment claim where plaintiff alleged that fellow mail carrier had telephoned her and threatened her, fellow worker called her a bitch, she was called "Missy," she was accused of unprofessional conduct, there was a rumor that she and her supervisor were having an affair, a poster was hung in the work place about her, she received unwanted subscriptions to Penthouse magazine, a carrier grabbed her butt, co-workers continuously commented that she had a "nice butt," and she saw two pornographic photographs posted in her work that she believed were directed at her), aff'd, 75 F.3d 1293 (8th Cir.1996).
Furthermore, defendant took "prompt remedial action reasonably calculated to end the harassment." Callanan v. Runyun, 75 F.3d 1293, 1296 (8th Cir.1996) (quoting Davis v. Tri-State Mack Distributors, Inc., 981 F.2d 340, 343 (8th Cir.1992)). The record shows defendants investigated the comments, took action to reprimand those involved and that the comments stopped.
For these reasons, summary judgment is appropriate on this claim.

Retaliation claim
Plaintiff alleges in her complaint that she engaged in protected activity when she reported sex discrimination and sexual harassment using Wausau's internal procedures and filed an EEOC charge and when she advised another employee (Swit) to report discriminatory comments to Wausau's legal office. She alleges that the company's employee handbook provided that employees within a function are to be considered first for job openings in that area. Following *1412 her involvement in protected activity, plaintiff alleges that the defendants departed from established standards pertaining to the identification of offices within which a human resources function would be performed and eliminated her job. She also alleges that she was not selected for the Houston position nor given a job elsewhere in the organization based on her involvement in protected activity.
To establish a prima facie case of retaliation under Title VII, plaintiff must show (1) that she was engaged in a protected activity; (2) that an adverse employment action occurred; and (3) that there is a causal connection between the two. Sweeney v. City of Ladue, 25 F.3d 702, 703 (8th Cir. 1994). If the employee establishes a prima facie case, the employer must articulate a legitimate non-discriminatory reason for its actions. If the employer meets this burden, the employee must show that the proffered reason is pretextual. Kobrin v. University of Minnesota, 34 F.3d 698, 704 (8th Cir. 1994).
Defendants do not dispute that plaintiff was engaged in a protected activity and that she was subject to an adverse employment action. Defendants argue that they are entitled to summary judgment on plaintiff's retaliation claim because (1) there is no evidence of a causal connection between any adverse employment actions and plaintiff's complaints of discrimination and (2) there is no evidence of pretext to rebut defendants' legitimate and nondiscriminatory reasons offered for the employment decisions that were made.
In support of the third element of the prima facie case, plaintiff points to the timespan between the protected activity and the adverse employment action. She argues that her protected activity began much earlier than December 23, 1992, when plaintiff filed her EEOC charge. She argues that protected activity included her reports of Stark's alleged discriminatory remarks to Bosshard, her complaints to Bosshard of sexual harassment during the May 28, 1992, seminar, and her involvement in the Waterman and Swit matters. Such reports are protected activity under Title VII. Davis v. Fleming Companies, Inc., 55 F.3d 1369, 1371 (8th Cir.1995).
The court concludes that the close proximity in time between plaintiff's complaints (including her EEOC charge) and the adverse employment actions establish a genuine issue of material fact on the third element of the prima facie case. O'Bryan v. KTIV Television, 64 F.3d 1188, 1193 (8th Cir.1995); Davis, 55 F.3d at 1372-74. Cf. Stevens v. St. Louis University Medical Center, 97 F.3d 268, 270-71 (8th Cir.1996) (avoiding issue of "whether a temporal connection alone will ever suffice to establish proof of causation").
Defendant has come forward with legitimate, nondiscriminatory reasons for its conduct. Therefore, plaintiff must produce some additional probative evidence of pretext, beyond her assertion that the timing of the adverse employment actions raises the inference of retaliation. Stevens, 97 F.3d at 272. Plaintiff has produced evidence showing that prior to filing her EEOC charge and reporting complaints of harassment, she received outstanding performance evaluations from Bosshard. Plaintiff has also produced evidence showing that the two male managers (Stark and Bosshard) who had received reprimands because of plaintiff's protected activity were among those from whom Mayo sought information about plaintiff when he was considering filling the Houston position. The managers made negative comments to Mayo about plaintiff's performance and many of the comments directly contradict statements made in her most recent evaluation in 1991. (Pl.'s Exh. 6.) In addition, plaintiff has produced evidence that her supervisor, Bosshard, had told Mayo before his decision on the Houston position that plaintiff had been having emotional problems and had been involved "from an EEO standpoint." Based on this record, the court concludes that there are genuine issues of material fact on the issue of pretext. O'Bryan, 64 F.3d at 1194-95 & n. 6.

ADA claim
Plaintiff alleges in her complaint that defendants' elimination of the human resources function in St. Louis, their termination of *1413 plaintiff, their refusal to select plaintiff for the Houston human resources position, and their failure to place plaintiff in any other position within the Wausau/Nationwide Enterprise were motivated by discrimination against plaintiff on the bases of her record of disability and/or their perception that she was disabled.
The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a) (1995). A plaintiff may use the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), to prove a claim of intentional discrimination. Price v. S-B Power Tool, 75 F.3d 362, 364-65 (8th Cir.), cert. denied, ___ U.S. ___, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996). This method of proof requires plaintiff to establish her ability to prove a prima facie case, which, in the absence of an explanation from her employer, creates a rebuttable presumption of discrimination. Id. at 365. To establish a prima facie case under the ADA, plaintiff must show (1) that she is a "disabled" person within the meaning of the ADA, (2) that she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) that she has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1318 (8th Cir.1996). An inference of discrimination may be raised by evidence that plaintiff was replaced by or treated less favorably than similarly situated employees who are not in plaintiff's protected class. Price, 75 F.3d at 365.
Once plaintiff establishes her prima facie case, the burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for its actions. Id. The burden then shifts back to the plaintiff to prove that the employer's proffered reason is pretextual and that the intentional discrimination was the true reason for the employer's actions. Id.
Defendants argue that they are entitled to summary judgment on plaintiff's ADA claim because (1) plaintiff is not within the protected group ("disabled") under the statute; (2) there is no evidence of a causal connection between the alleged adverse employment actions and any perceived disability; and (3) there is no evidence of pretext to rebut defendants' legitimate and nondiscriminatory reasons for its actions.
The ADA defines "disability" in three ways:
(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.
42 U.S.C. § 12102(2). Plaintiff's condition falls within the ADA's mental impairment requirement. The Act's supporting regulations define impairment as "[a]ny mental or psychological disorder," such as an emotional or mental illness. 29 U.S.C. § 1630.2(h)(2).
The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," which, if substantially limited by an impairment, would qualify a person as disabled within the meaning of the ADA. 29 C.F.R. § 1630.2(i). "Significantly limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Aucutt, 85 F.3d at 1319 (quoting 20 C.F.R. § 1630.2(j)(3)(i)). To defeat the summary judgment motion, plaintiff must present evidence from which a reasonable jury could find that her impairment restricted her ability to perform either a class of jobs or a broad range of jobs in various classes. To determine whether a person is substantially limited in a major life activity, the court must consider (1) the nature and severity of the impairment, (2) its duration or expected duration, and (3) its actual or expected long-term impact. 29 C.F.R. § 1630.2(j)(2). An inability to perform a single particular job *1414 does not constitute a substantial limitation of the individual's ability to work. Maulding v. Sullivan, 961 F.2d 694, 698 (8th Cir.1992), cert. denied, 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993). When determining whether the impairment substantially limits the person's life activity of work, three additional factors are relevant: (1) the number and type of jobs from which the impaired person is disqualified, (2) the geographical area to which the individual has reasonable access, and (3) the person's job expectations and training. 29 C.F.R. § 1630.2(j)(3)(ii); Welsh v. City of Tulsa, 977 F.2d 1415, 1419 (10th Cir.1992).
Plaintiff alleges in her complaint that she is "disabled" under the Act because she has a record with defendants or was perceived by defendants as suffering from a psychiatric disorder or condition, which if it actually existed, would substantially limit her ability to work. She alleges that, although the defendants' Employee Assistance Plan director had informed plaintiff's psychiatrist that plaintiff was suicidal, she was not, in fact, suicidal and did not suffer from an emotional or psychiatric condition which would have rendered her unable to perform the essential functions of her position in St. Louis, the Houston human resources position, or any other position within Wausau or Nationwide for which plaintiff was qualified by reason of her education, work experience, skills and training.
Thus, plaintiff is arguing that she is disabled under the ADA disability definition subsection (B) ("a record of such an impairment") or (C) ("being regarded as having such an impairment").
Under the second definition of disability, the supporting regulations define "a record of such impairment" as "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k). The record of impairment in this case includes two leaves of absence (from July 22-30, 1992, and December 22, 1992, to January 25, 1993) from Dr. Jones who stated that plaintiff was diagnosed as having post-traumatic stress disorder. Plaintiff had also informed her supervisor, Bosshard, by electronic mail of her problems and informed him that she had been diagnosed with clinical depression. While Schmidt's EAP notes are contained in the record, there is no evidence that those notes were shared with anyone. The court concludes that this is insufficient, as a matter of law, to constitute a record of impairment that substantially limited a major life activity. See School Board of Nassau County v. Arline, 480 U.S. 273, 281, 107 S.Ct. 1123, 1127-28, 94 L.Ed.2d 307 (1987) (finding that plaintiff had a record of impairment because she had a history of tuberculosis that dated to her diagnosis and hospitalization in 1957, then went into remission and returned 20 years later when plaintiff had three relapses in two years); Doe v. Kohn Nast & Graf, P.C., 862 F.Supp. 1310, 1322 (E.D.Pa.1994) (finding that plaintiff did not have a record of impairment under ADA where he had only been diagnosed with HIV one year prior to termination, which was not long enough to constitute a history of impairment). Cf. Pritchard v. Southern Company Services, 92 F.3d 1130, 1132, 1134 (11th Cir.1996) (finding evidence of record of impairment where plaintiff had been diagnosed in 1990 with depression and then placed by employer in 1992 on paid disability leave and then unpaid disability leave). Plaintiff has failed to show a history of impairment that substantially limited her employment as a whole. Maulding, 961 F.2d at 698. Her inability to perform a single particular job for a particular employer does not constitute a substantial limitation of the her ability to work. Byrne v. Board of Education, 979 F.2d 560, 565 (7th Cir.1992); Welsh, 977 F.2d at 1418-19; Maulding, 961 F.2d at 698. Plaintiff has failed to come forward with evidence showing a significant restriction in her ability to perform either a class of jobs or a broad range of jobs in various classes. At most, the record indicates that plaintiff's problems stemmed from the May 28, 1992, incident, which would indicate an inability to perform a particular job and does not indicate a history of impairment, as defined by the regulations.
Under the third definition of disability, "being regarded as having such an impairment," *1415 the supporting regulations define the phrase as follows:
(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
(3) Has none of the impairments defined in paragraph (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.
29 C.F.R. § 1630.2(1). Under this part of the definition, Congress intended to protect people from a range of discriminatory actions that are based on myths, fears and stereotypes about disability, which occur even when a person does not have a substantially limited impairment. Muller v. Automobile Club of Southern California, 897 F.Supp. 1289, 1297 (S.D.Cal.1995) (quoting 1 EEOC Technical Assistance Manual § 2.2(a), reprinted in ADA Manual (BNA) § 90:0512 (1992)).
Plaintiff must not only show that the employer perceived her as impaired, but that the perceived impairment substantially limited a major life activity. Marschand v. Norfolk and Western Railway Co., 876 F.Supp. 1528, 1540 (N.D.Ind.1995), affd, 81 F.3d 714 (7th Cir.1996). An employer does not regard an employee as disabled simply by finding the employee incapable of satisfying the singular demands of a particular job. Byrne, 979 F.2d at 567; Welsh, 977 F.2d at 1419; Maulding, 961 F.2d at 698. The proper test is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs. Marschand, 876 F.Supp. at 1541.
Therefore, for plaintiff to prevail on a perceived disability claim, she must show (1) that the defendants treated her as having an impairment that substantially limited one or more of plaintiff's major life activities and (2) that either (a) while she had a physical or mental impairment, it was not substantially limiting or (b) that she did not suffer at all from a statutorily prescribed physical or mental impairment. Cook v. Rhode Island Department of Mental Health, Retardation, and Hospitals, 10 F.3d 17, 23 (1st Cir.1993); 29 C.F.R.Pt. 1630, App. Thus, "if an individual can show that an employer ... made an employment decision because of a perception of disability based on `myth, fear or stereotype,' the individual will satisfy the `regarded as' part of the definition of disability." Cook, 10 F.3d at 23. "A person is `regarded as having' a physical impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment." Wooten v. Farmland Foods, 58 F.3d 382, 385 (8th Cir.1995) (citing 29 C.F.R. § 1630.2(l)(3) (1995)). "The focus is on the impairment's effect upon the attitudes of others." Id. Therefore, the court's inquiry is whether the plaintiff is perceived to have a physical or mental impairment, and, if so, whether the impairment is perceived to substantially limit one or more of plaintiffs major life activities. Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 722 (2d Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).
Defendants argue that there is no evidence that defendants regarded plaintiff as having an impairment that substantially limited a major life activity. They argue that Cecil Mayo, the person who made the decision to eliminate the human resources function in St. Louis and chose another person for the Houston human resources position, did not know plaintiff had a disability or regard her as having a disability that would prevent her from performing her job. Defendants admit that Mayo knew plaintiff was experiencing emotional problems relating to her family. Furthermore, plaintiff told Bosshard that she had been diagnosed as having clinical depression.
Plaintiff argues that the evidence shows that Bosshard knew the following:
(1) On June 1, 1992, Stark was talking to plaintiff about the May 28, 1992, incident when plaintiff's head went back and her eyes began to roll. She nearly passed out and was taken to the hospital. (Pl.'s Dep., Vol. I, at 224-25.) Stark informed Mayo that plaintiff was very emotional and cried *1416 when a matter concerned her. (Pl.'s Exh. 19).
(2) On July 20, 1992, Schmidt informed Wausau's legal counsel, Sue Leonard, that plaintiff was attributing the onset of her symptoms to the May 28, 1992, incident. (Pl.'s Exh. 13 at W0002623.)
(3) On July 21, 1992, he received an e-mail message from plaintiff, who stated that she was frightened about her mental stability, found herself terrified at the thought of coming to work, she shook throughout the day, and the most important aspect of her work, her job, was out of control. (Pl.'s Exh. 11.)
(4) A few days later, Bosshard received a letter from a psychiatrist stating that plaintiff must be off from work. (Pl.'s Exh. 12.)
(5) On December 15, 1992, plaintiff had informed Bosshard that she was clinically depressed. (Defs.' Exh. O.) Schmidt was concerned that this put defendants on notice. (Pl.'s Exh. 13 at W0002618.) Schmidt's record refers to plaintiff thinking about suicide. (Id. at W0002624.) Bosshard knew that plaintiff was on an extended leave of absence at Christmas in 1992.
(6) Sometime before January 4, 1993, Bosshard spoke with Ari Schmidt about plaintiff. Based on Mayo's notes of his discussion with Bosshard, Schmidt stated that plaintiff had been in contact with EAP because of depression, anxiety and emotional problems. Mayo's notes contain other references to Bosshard's comments about plaintiff's mental status: "was off after incident  less than 10 days," "had marital and parenting problems that took their toll."
The record is sufficient to support a finding that defendants received information of, and regarded plaintiff as having, a severe impairment. It is clear that defendants granted her two leaves of absence upon representations from Dr. Jones that she had post-traumatic stress disorder, and that plaintiff defined herself as unable to work. Wooten, 58 F.3d at 386; Byrne, 979 F.2d at 567. Pritchard, 92 F.3d at 1134 (finding evidence that employer regarded her as being impaired where employer refused to accept her resignation and instead placed her on paid disability leave and then on unpaid disability leave); Holihan v. Lucky Stores, Inc., 87 F.3d 362, 366 (9th Cir.1996) (reversing summary judgment for defendant on "regarded as" claim where employer called plaintiff into two meetings to discuss his aberrational behavior, asked him if he had any "problems" and encouraged him to seek EAP counseling, and where defendant also received doctors' reports diagnosing his depression, anxiety and stress).
In this case, the record of plaintiff's ability to perform her usual work functions is equivocal. She returned to work and defendants interviewed her for the Houston job. The record reveals discussions Mayo had separately with Bosshard and Stark concerning plaintiff's mental status. Plaintiff argues that Mayo's notes of his conversation with Bosshard show that Schmidt, based on her knowledge of plaintiff's psychiatric/emotional history, advised Bosshard that plaintiff was not suitable for continued employment or for promotion. This argument is speculative. Mayo's recollection of the conversation with Bosshard was that they discussed her attendance and being ill and out of the office. (Mayo Dep. at 214-16, 256.) The notes literally reflect nothing more than an update on plaintiff's condition. (Pl.'s Exh. 18.) Mayo stated that the conversation was not in connection with consideration for any position. (Mayo Dep. at 261.) Mayo stated that he did not review these notes when making the decision whether to hire plaintiff for the Houston position. (Id. at 262.) However, the notes apparently ended up in a file that Mayo had marked "Houston management position," which he contends was done inadvertently. (Mayo Dep. at 262-64.)
Mayo's notes of his conversation with Stark indicate a more detailed conversation about her abilities to do her job, including comments such as "out of office quite a bit for back prob; stress" and "not uncommon to take couple day a wk; no one to police;" "very emotional; over reacts; if personal crisis" (Pl.'s Exh. 18.)
Even if plaintiff is "disabled" under the statute, defendant argues that there is no *1417 evidence of a causal connection between the alleged adverse employment actions and any perceived disability and there is no evidence of pretext to rebut defendants' legitimate and nondiscriminatory reasons for its actions.
Defendant has offered legitimate non-discriminatory reasons for its employment decisions. Defendants have stated that plaintiff's job was eliminated in the reorganization because there were not enough human resources duties in St. Louis after the reorganization to warrant a human resources position in St. Louis. They also have stated that she was not hired for the Houston position because Segovia was the best qualified candidate.
In response, plaintiff makes four arguments to show that defendants' reasons were pretextual: (1) she was the only human resources specialist in any satellite office in Wausau who lost her job in the reorganization; (2) before the final selection was made for the Houston human resource position, Cecil Mayo sought the input of Roger Lucus and Susan Leonard; (3) plaintiff was qualified, appears to have done her work and was released by her psychiatrist to return to work; and (4) rather than terminate her, defendants used the reorganization to eliminate her job and then terminate her.
First, the fact that plaintiff was the only human resources person in a satellite office to lose her job does not show pretext. The only offices with a human resources position in the South Central Region at the time the St. Louis position was eliminated were San Antonio (which was the headquarters of the South Central Region, where the clerical and general processing functions would be centralized and where Mayo was located); Dallas (which had more than 200 employees); Houston (which had more than 100 employees and was responsible for 25 to 30 employees in New Orleans); and Kansas City (which had more than 200 employees in its office). (Mayo Dep., Vol. I, at 61-62, 110-112; Vol. II at 152-54, 164, 178.) St. Louis, with 50 employees (Pl.'s Dep., Vol. III, at 6), had considerably fewer employees.
Second, the fact that Cecil Mayo talked to Roger Lucus and Susan Leonard before Mayo decided who to hire for the Houston position does not show pretext. The evidence shows that Lucus and Leonard met Segovia while on other business in Houston and only confirmed Mayo's decision to offer Segovia the position. (Lucas Dep. at 94-98; Mayo Dep., Vol. II, at 182-85.)
Third, plaintiff argues that she was more qualified for the Houston position than was Segovia. Plaintiff argues that Mayo selected Segovia for the Houston position after ignoring the principal qualification standard of four years' human resource experience, allegedly because Segovia had strong self-development, was involved in a professional organization, and had managerial experience. However, the requirement states a minimum of four years of work experience with the company as a human resources representative, an equivalent position with another company, or in other company jobs providing comparable experience. (Pl.'s Exh. 16.) Mayo testified that Segovia was chosen because she had "cross pollination" because she had a broad understanding of what went on in other departments because she had been a sales representative, where she had an opportunity to develop interpersonal skills, had been a payroll technician and a systems coordinator, which required extensive interaction with people, and was a coding supervisor. (Mayo's Dep., Vol. II, at 245-48.) Therefore, Mayo believed she had an excellent background for moving into human resources. (Mayo Dep., Vol. II, at 248.) However, the reasons stated for why plaintiff was not chosen for the job are not supported by the record. For example, the information given to Mayo from Bosshard and Stark about plaintiff's job performance was contradicted in Bosshard's glowing performance evaluations of her.
Fourth, plaintiff has offered no evidence to support her argument that defendants used the reorganization to eliminate her job and then terminate her.
Based on this record, the court concludes that there are disputed issues of material fact on this claim that preclude summary judgment.

*1418 Claims against Nationwide

Defendant Nationwide argues that it is entitled to summary judgment on plaintiff's claims because Nationwide was not plaintiff's employer, was not listed in her charges of discrimination, and made no decisions regarding the position in Houston or the elimination of plaintiff's position.
First, it is clear that both Wausau and Nationwide were named in plaintiff's discrimination charge. (Defs.' Ex. G; Pl.'s Exh. 21.)
Plaintiff argues that Wausau and Nationwide are a single employer. In examining that issue, the court must consider the (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership of financial control. Baker v. Stuart Broadcasting Co., 560 F.2d 389, 392 (8th Cir.1977).
Nationwide had affiliated with Wausau in 1985, with Wausau becoming a component of Nationwide. (Mayo Dep. at 15, 26.) Nationwide put large amounts of money into Wausau to strengthen Wausau and after that, Nationwide exerted control over Wausau operations. (Mayo Dep. at 26.) Mayo, who made the hiring decision for the Houston position, testified that he worked for Nationwide and that he did not become a Wausau employee until January 1, 1993. (Mayo Dep. at 7, 16.) When Wausau's western operations merged with Nationwide's western operations, those affected Nationwide employees became Wausau employees. However, Mayo testified that it was all the same enterprise. (Mayo Dep. at 17, 40.)
The court concludes that the record is insufficient at this time to dismiss Nationwide from the action. The plaintiff has produced enough evidence to preclude summary judgment.
An appropriate order is issued herewith.
NOTES
[1] These pages are not in the record but defendants do not dispute plaintiff's citation to them.
[2] The pages from Bosshard's deposition cited in support of this evidence are not included in the record. However, defendants do not dispute the accuracy of plaintiff's account of the deposition testimony.