144 F.Supp.2d 1112 (2000)
Steve GALAMBOS, Plaintiff,
v.
FAIRBANKS SCALES, Defendant.
No. 4:98CV1818 ERW.
United States District Court, E.D. Missouri, Eastern Division.
July 21, 2000.
*1113 *1114 Lois Spritzer, Van Amburg and Chackes, St. Louis, MO, for Steve Galambos, plaintiff.
Robert J. Tomaso, Blackwell Sanders Peper Martin LLP, St. Louis, MO, Mary Elizabeth Metz, Blackwell Sanders Peper Martin LLP, Kansas City, MO, for Fairbanks Scales, defendant.

MEMORANDUM AND ORDER
WEBBER, District Judge.
This matter is before the Court on Defendant Fairbanks Scales ("Scales") Motion *1115 for Summary Judgment [document # 84].
Plaintiff Steve Galambos brings this five-count action pursuant to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., as amended, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, et seq., and the Missouri Human Rights Act ("MHRA"), R.S.Mo. § 621 et seq.[1] Galambos alleges that after thirty years of employment with Scales, the company illegally terminated him because of his age, fifty-one, and his disability, a heart attack he suffered on August 19, 1996.

I. STATEMENT OF GENERAL RELEVANT FACTS

Viewing the facts of this case in the light most favorable to plaintiff, the Court sets forth the following general facts:
Scales manufactures and distributes light and heavy capacity scales for use in the weighing industry. Through the company's national service organization, it also provides service and maintenance for scales. At the time of Galambos's termination, Scale's service was distributed through a number of service centers located throughout the country. Repairs were made either at the facility or by service technicians who traveled to the customer's place of business. The service centers also sold service contracts for ongoing service and maintenance. Galambos, who was born in 1945, was hired by Scales as a technician in 1968. In 1979, Galambos was promoted to the position of Area Service Manager, the position he held until his termination in January 1997.
As Area Service Manager of the St. Louis service center, Galambos was responsible for overseeing the entire service center operation, including the servicing of scales and the sales of service contracts and new scales. Thus, his duties included providing installation and maintenance of weighing products and related apparatus for customers within his assigned geographic area through direction, supervision, and business management of the activities of skilled field service technicians, as well as marketing the service business and increasing its growth. Galambos directly supervised seven technicians and a secretary.
Galambos's performance, as reflected by the productivity of the St. Louis service center, is of significant concern in this case, because Scales maintains that poor performance was the impetus for Galambos's dismissal. In his affidavit, Galambos states that he received an overall rating of "fully meets requirements" in every evaluation he received from Scales in his thirty years of employment. Galambos notes that while some evaluations noted areas where improvement was needed, no one at Scales ever stated or suggested that his performance was poor or that he was in danger of losing his job until after his heart attack. Scales points out that only the last two of these evaluations are included in the record in this case but does not otherwise dispute Galambos's sworn statements in his affidavit concerning his performance history with the company. Galambos received service awards for his performance in 1981, 1982, 1986, and 1988 and twice received a gold ring as one of the top five *1116 service managers. Galambos also states in his affidavit that he received a $6000 bonus in 1995. Scales notes that Galambos offers no evidence that he received such a bonus; additionally, Dave Ehrnschwender (the Director of Service Operations to whom Galambos's immediate supervisor, Wade Theuerkauf, reported) stated in his deposition that a $6000 bonus would have been average in 1995. The St. Louis service center was ranked sixth in the nation in 1995, a ranking which Theuerkauf testified was not average, but good.
The financial records before the Court indicate revenues for the St. Louis service center of $783,000, $779,000, $962,000, $995,000, and $900,000 in the years 1992 through 1996, respectively, while revenues dropped to $815,000 in 1997 after Galambos's termination in January of that year. Additionally, profits were $161,000, $128,000, $159,000, $186,000, and $130,000 in the years 1992 through 1996. Scales notes that the rate of revenue to profit for the St. Louis shop fluctuated from 1992 to 1996, with rates of 20.6%, 16.4%, 16.5%, 18.7%, and 14.4%, respectively. Scales's records also indicate that service contract sales for the St. Louis shop did not meet the stated goals for 1996. Galambos offers as an explanation for the lower performance of his shop in 1996 that one of his technicians, Bill Whalen, was absent for the first few months of the year because of heart problems; another technician, Al Hood, missed work on several occasions because of his wife's illness and lung transplant; Galambos himself had a heart attack in August; and there was no secretary in the St. Louis shop for most of 1996.
In Galambos's last performance evaluation before his heart attack, administered to him in February, 1996 for his performance in 1995, Theuerkauf rated him as fully meeting all standards. Theuerkauf praised Galambos's over-budget[2] performance in revenue and cost, the increase in his total labor and billing rate over the previous year, and his attention to resolving customer disputes. Theuerkauf criticized Galambos in the area of growth goals/measurements, stating that he had "unacceptable activity in this most important area. Emphasis must be placed individually and on your staff to quote for increased core growth." Theuerkauf summarized the evaluation as follows:
Over budget performance enhanced by problems faced in resident areas [low productivity by Allen and Whalen]. Your dedication forced results. Train new hires early to avoid diminished revenues. Focus entire staff on quotation activity needed to sustain growth objectives of 1996 budget.
Pl.Ex. 14. Theuerkauf testified in his deposition that he did not intend this evaluation to indicate poor performance or that Galambos was in imminent danger of losing his job, stating that Galambos was an average performer who met performance standards.
On August 8, 1996, Ehrnschwender conducted a routine audit of the St. Louis Service Center. In his report summarizing this audit, Ehrnschwender spoke positively about Galambos's open order report and disputed accounts. Ehrnschwender expressed concern at the low rate of quotation activity by the shop, which he declared must increase, stated that the average time between completion of jobs and billing them was unacceptably long, noted that non-productive labor rates must be addressed, and criticized vacation scheduling which allowed Galambos, his secretary, and the Area Sales Manager all to take *1117 vacation during the same week. Nevertheless, after conducting this audit Ehrnschwender did not express any concerns to Theuerkauf about Galambos's management of the shop, nor did he intend the audit report to warn Galambos that his job was in jeopardy; rather, he hoped that it would serve as a training tool for Galambos. Theuerkauf confirmed in his deposition that neither he nor Ehrnschwender discussed placing Galambos on probation, though Theuerkauf noted that prior to the audit he had concern about the operation of the shop that year.
On August 19, 1996, Galambos suffered a myocardial infarction while on vacation on the east coast. Galambos required hospitalization, including a balloon angioplasty, and subsequently remained on a medical leave of absence until September 30, 1996. His primary care physician, Dr. John Hogan, released him to return to work on a part-time basis, with instructions to work as long as he could and then go home. However, he worked ten hours on his first day back. Galambos testified during his deposition that he did not discuss with Theuerkauf his doctor's recommendation that he work a reduced schedule, present his doctor's release note to anyone at Scales, or request a reduced work schedule.
One month later, on October 30, Galambos met with Theuerkauf. During his deposition, Galambos testified that Theuerkauf told him that "he was on the short list of people that they were looking to get rid of." Theuerkauf then presented Galambos with a Performance Improvement Plan (the "Plan"), which identified five specific performance goals that Galambos must achieve.[3] The Plan stated that Scales would monitor and measure his performance for a ninety-day period. The Plan stressed the importance of meeting or exceeding the goals, warning that "Failure to demonstrate significant improvement in the overall performance of the St. Louis Customer Support Center will seriously jeopardize your continuation in the position of Area Service Manager." Def.Ex. 9. Galambos testified that Theuerkauf appeared to be embarrassed and uncomfortable about presenting the Plan, which he called "dirty work," and that the two discussed the Plan and its performance goals only minimally. Theuerkauf testified during his deposition that he, Ehrnschwender, David Quinn (Vice President of Service, to whom Ehrnschwender reported), and Mike Hart (Executive Vice President, to whom Quinn reported) made the decision to place Galambos on probation shortly before Theuerkauf presented him with the Plan.
Scales terminated Galambos on January 29, 1997, the ninety-first day of his probationary period, before the final January statistics for profit and revenue were reported. Galambos had exceeded the revenue and FOP performance goals, earning over $231,000 in revenue and $38,723 in profit. Galambos testified that he also reviewed all existing contracts  the fourth goal in the Plan  though he had no written documentation of having performed these reviews. It is undisputed that Galambos *1118 did not meet twenty-five quotations per month goal; he testified that he was too busy doing other work, such as training a new salesman, to make these quotations and that his technicians did not bring in enough leads for him to meet this quotation goal. Galambos further testified that he did not conduct weekly meetings with all support center personnel because some of them worked 100 to 200 miles away from St. Louis. Galambos testified that he believed it would have been impossible for him to meet the revenue and profit goals if he had taken up his and his technicians' time in weekly meetings. Galambos further testified that he did not discuss the problems he saw in the goals with Theuerkauf or anyone else at Scales, but believed that because of his time with the company and good performance record, he would not be terminated.
The parties dispute the reasons and circumstances of Galambos's termination. Galambos's termination letter stated that he was being fired because of performance issues. Scales, through the depositions of Theuerkauf, Ehrnschwender, Quinn, and Hart, maintains that at the January 23 and 24, 1997 Quarterly Business Meeting ("QBR"), the group decided that although Galambos was projected to exceed the first two goals of his Plan, the St. Louis Service Center was not showing overall improvement in sales, revenue, and profit. The group decided to remove Galambos from his position as Area Service Manager and offer him a technical services position in Kansas City, Missouri. Shortly after the group made this decision, Mary Lou Ryan, Scales's Human Resources Manager, notified Hart that she had just received a telephone call from Kathy Schlereth, the newly-hired secretary at the St. Louis Service Center, who reported that she believed Galambos was sexually harassing her. It is undisputed that in 1991 or 1992, another secretary in the St. Louis Service Center, Vivian Van Reed, had complained that Galambos had sexually harassed her. In light of these two complaints, Hart decided to terminate Galambos instead of demoting him.
Galambos challenges Scales's position that management had decided to demote Galambos but changed this action to termination after learning of Schlereth's sexual harassment complaint. Galambos points out that in previous answers to interrogatories, Scales stated that "when Plaintiff failed to achieve the goals set forth in the performance improvement plan, Mr. Hart reviewed and approved Mr. Theuerkauf's recommendation to terminate Plaintiff, in consultation with Ms. Ryan, Mr. Ehrnschwender, and Mr. Quinn." Scales counters that it amended this answer to the current version of events, set forth supra, after depositions of Scales's managers revealed that they had planned to demote Galambos before learning of the sexual harassment complaint. Galambos notes that at Theuerkauf's deposition, he initially stated unequivocally that Schlereth's complaint was not a factor in the decision to terminate Galambos, and that he was not aware of this complaint until after the decision to terminate Galambos had been made. However, after Scales's counsel asked for a break in deposition and consulted with Theuerkauf, Theuerkauf returned to the deposition and asked to clarify his answer. At that time, Theuerkauf stated that although at the QBR meeting the managers had decided to remove Galambos from the Area Service Manager position, Hart subsequently made the actual termination decision. Galambos also sets forth Ryan's deposition, in which she testified that although she was not directly involved in the decision to terminate Galambos, it was her recollection that the decision to terminate Galambos had been made before Ryan received the phone call from Schlereth complaining of sexual harassment.
*1119 After his termination, Galambos filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In its May 2, 1997 Position Statement to the EEOC,[4] Scales stated that "by the end of the three-month period, in late January, 1997, Charging party had not achieved any of the five sated [sic] goals, contained in the October 30 memorandum from Theuerkauf." Scales does not dispute that it never stated to the EEOC that Galambos was terminated because of sexual harassment or that a complaint of sexual harassment had been made against them. Scales explains this discrepancy between its position statement to the EEOC and the position it takes in its motion for summary judgment by stating, as noted supra, that it did not learn the full circumstances of Galambos's termination until the depositions of the managers and executives who participated in this decision.
Immediately after Galambos's discharge, John Cerrone, the Regional Service Manager, assumed Galambos's role and proceeded as acting Area Service Manager. Cerrone was forty years old at the time. Gary Pelletier was offered the St. Louis Area Service Manager position on April 1, 1997. He was forty years old when he assumed the position. Galambos is currently employed by Champion Scale Company performing sales and service work, a position he has held since June 30, 1997.

II. SUMMARY JUDGMENT STANDARDS

The standards applicable to summary judgment motions are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to *1120 `secure the just, speedy and inexpensive determination of every action.'" Id. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).
In order to obtain summary judgment, the moving party must demonstrate "an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party carries this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on allegations or denials in the pleadings, but must "come forward with `specific facts showing that there is a genuine issue for trial.'" Id. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(3)).
In analyzing summary judgment motions, the Court is required to view the facts in a light most favorable to the nonmoving party, and must give the non-moving party the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 587, 106 S.Ct. 1348; Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). Moreover, this Court is required to resolve all conflicts in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir.1976). The trial court may not consider the credibility of the witnesses or the weight of the evidence. White v. Pence, 961 F.2d 776, 779 (8th Cir.1992).

III. ANALYSIS

Galambos claims that Scales discriminated against him on the basis of his age and disability by terminating him. In employment discrimination cases such as this one based upon indirect evidence of discrimination, courts utilize the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Vaughn v. Roadway Express, Inc., 164 F.3d 1087, 1089 (8th Cir.1998). Under this three-step analysis, the plaintiff must first present a prima facie case of discrimination. Id. at 1090. If the plaintiff does so, a rebuttable presumption of discrimination arises, and the burden then shifts to the defendant to rebut this presumption through the articulation of a legitimate, nondiscriminatory reason for the employment action. Id. (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). If the defendant advances a nondiscriminatory reason for its employment action, the presumption disappears, leaving the plaintiff with the burden of proving discrimination. The Supreme Court has recently addressed plaintiff's burden of proof at this third step of the analysis:
Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff  once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision  must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the *1121 plaintiff's prima facie case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.
Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000) (internal citations and quotations omitted). The Supreme Court specifically rejected the Court of Appeal's holding that a prima facie case of discrimination, coupled with sufficient evidence for a trier of fact to disbelieve the defendant's legitimate, nondiscriminatory reason for its decision, is insufficient as a matter of law to sustain a jury's finding of intentional discrimination unless the plaintiff presented additional evidence of intentional discrimination. Rather, the Supreme Court held, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Id. at 2108. The Court continued:
The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.
Id. (quoting Hicks, 509 U.S. at 511, 113 S.Ct. 2742).

1. Galambos's Claims of Age Discrimination

To establish a prima facie case of age discrimination, Galambos must demonstrate that (1) at the time he was fired, he was a member of the class protected by the ADEA ("individuals who are at least 40 years of age," 29 U.S.C. § 631(a)); (2) he was otherwise qualified for the position of Area Service Manager; (3) he was discharged by Scales; and (4) he was replaced by a younger employee. Reeves, 120 S.Ct. at 2106. Scales argues that Galambos cannot satisfy the second and fourth elements of a prima facie case of age discrimination. As to the second element, Scales asserts that Galambos cannot establish that he was qualified for the position of Area Service Manager because he completed only two of the five goals in the Plan and because he sexually harassed his secretary at the St. Louis Service Center. Galambos asserts in response that to require him disprove Scales's legitimate nondiscriminatory reason as part of his prima facie case is an analytically flawed argument that has been repeatedly rejected by the Eighth Circuit. The Court agrees with Galambos. As the Eighth Circuit stated in Gill v. Reorganized School District R-6, Festus, Missouri, "[t]o establish her prima facie case, [plaintiff] was not required to disprove the reason given for her discharge." 32 F.3d 376, 378 (8th Cir.1994). In this case, Scales cites Galambos's failure to meet the goals of the Plan, as well as his alleged sexual harassment of Schlereth, as the reason for his discharge, while Galambos maintains that these matters were merely pretext for discrimination. The Court will not require Galambos to disprove Scales's nondiscriminatory reason  thereby turning the McDonnell Douglas test on its head  at this stage of its analysis.
Moreover, the Court believes that the record demonstrates that Galambos was qualified. The Court notes that in Galambos's last performance review before his termination, Theuerkauf rated him as fully meeting the standards of his position. Also, after his audit of Galambos's St. Louis shop, Ehrnschwender did not warn Galambos that his job was in jeopardy as a result of the audit findings; instead, he hoped that the audit report would serve as a training tool for Galambos. Accordingly, the Court finds that Galambos has established *1122 that he was qualified for his work at Scales at the time of his termination. See Keathley v. Ameritech Corp., 187 F.3d 915, 920 (8th Cir.1999) (finding that employee with excellent sales record was qualified at the time of her termination, despite employer's contentions of other problems with her job performance, where employee asserted that employer's stated reasons were pretext for age discrimination).
As to the fourth element, Scales contends that because Cerrone performed Galambos's duties along with his own job as Regional Service Manager for a period of three months after Galambos's termination, and because Pelletier, who became Area Service Manager at the St. Louis shop after that time, was forty when he assumed the position (and thus a member of the protected class under the ADEA), Galambos cannot establish this element. The Court disagrees. The Eight Circuit has stated that "replacements" are to be reviewed on a case by case basis, emphasizing that elements of a prima facie case are not intended to be rigid. Keathley, 187 F.3d at 920-21. Applying this flexible standard, the Court finds that while Cerrone was performed the duties of Galambos's position on a short-term basis, Pelletier was his actual replacement. Furthermore, contrary to Scales's assertion, the fact that Pelletier was forty when he took up this post is not fatal to Galambos's prima facie case. In O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the Supreme Court rejected a Court of Appeal's requirement that a plaintiff must show that he was replaced by someone outside the age group protected by the ADEA to make out a prima facie case of age discrimination. The Court reasoned that "[t]he fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out because of his age. Or to put the point more concretely, there can be no great inference of age discrimination ... when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old." Id.; see also EEOC v. McDonnell Douglas Corp., 191 F.3d 948, 951 (8th Cir.1999) (recognizing O'Connor's holding as applicable to disparate treatment ADEA cases). This Court finds Galambos's showing that he was replaced by a man eleven years his junior is sufficient to establish the fourth element of his prima facie case.
As intimated supra, Scales has provided a legitimate nondiscriminatory reason for terminating Galambos, asserting that the company decided to demote him for failing to achieve all five of the performance goals in during his probation period, and that, after receiving information about a complaint from Schlereth that Galambos had sexually harassed her, Hart decided to terminate Galambos instead of demoting him.
The burden now shifts back to Galambos to raise a material fact dispute as to whether Scales's stated reasons for terminating him are a pretext for intentional age discrimination. After careful consideration of the totality of the circumstances of this case, the Court believes that Galambos has made such a showing.
The Court agrees with Galambos that Scales's shifting reasons for terminating him support an inference of discrimination. Scales initially stated in interrogatories and in its position statement to the EEOC that after Galambos failed to meet the goals set forth in the Plan, Hart approved Theuerkauf's recommendation to terminate him, in consultation with Ehrnschwender, Quinn, and Ryan. Later, Scales presented a different version of events, stating that after the assembled executives decided to demote him, Hart learned of Schlereth's complaint and decided, *1123 instead, to terminate Galambos. Scales explains these shifting reasons for termination by claiming that it did not learn that Hart had terminated Galambos because of the sexual harassment complaint until the depositions of the company employees involved in his termination. Four components of the record undermine the credibility of Scales's explanation. First, Galambos's termination letter states that he was terminated for performance problems. Second, Ryan, at the time Scales's Human Resources Manager (and now no longer employed by Scales) has stated her firm recollection that the decision to terminate Galambos had been made before she received the phone call from Schlereth. Third, at Theuerkauf's deposition, he initially stated unequivocally that Schlereth's complaint was not a factor in the decision to terminate Galambos, and that he was not aware of this complaint until after the decision to terminate Galambos had been made. After his counsel requested a break in the deposition and consulted with him, Theuerkauf altered his answer to one consistent with Scales's currently asserted version of events. Fourth, Scales initially stated to the EEOC that Galambos had failed to accomplish any of the five goals of the Plan, even though notes from the QBR meeting demonstrate that the assembled executives knew that he was projected to exceed the objectives of the first two goals. The Court finds that this evidence could reasonably be interpreted to show that Scales has twice changed its stated reason for terminating Galambos and that the reason Scales offered at the time of Galambos's dismissal (performance problems) is inconsistent with the reason it now presents to the Court (sexual harassment allegations). The company's inconsistent explanations are sufficient to support an inference of discrimination. See Young v. Warner-Jenkinson Co., Inc., 152 F.3d 1018, 1022 (8th Cir.1998). The fact that Scales stated first that Galambos had been terminated because he failed to accomplish all five of the Plan goals, then changed that reason to his failure to accomplish three of the Plan goals, and finally altered that reason to his having sexually harassed his secretary could cause a reasonable finder of fact to infer that none of Scales's stated reasons can be trusted and that Scales's true motivation was illegal discrimination.
Additionally, the Court believes that Galambos has presented evidence which creates a factual dispute as to whether Scales put him on probation and promulgated the Plan in order to set him up for discharge. Galambos, who had been awarded for his performance several times during his eighteen year tenure as Area Service Manager, stated during his deposition that it would have been impossible for him to meet all five of the Plan's goals, because the time it took to increase the shop's revenues precluded him from holding weekly meetings with his far-flung technicians and because he could not generate the required number of quotations unless his technicians gave him sufficient leads. Also, Theuerkauf and Ehrnschwender readily admitted in their depositions that when they pointed to problems in Galambos's performance in his 1995 performance evaluation and the August 1996 shop audit, they neither warned Galambos that his job was at risk nor discussed putting him on probation. It was only after he returned from medical leave that he was told he was "on the short list of people that they were looking to get rid of," put on probation, and then terminated. See O'Bryan v. KTIV Television, 64 F.3d 1188, 1194 (8th Cir.1995) (holding that plaintiff raised a factual dispute as to his retaliation claim where a few months after his protected activity, he was "subjected to unprecedented job scrutiny, was required to meet brand new job performance guidelines, *1124 and was given a probationary ultimatum which led directly to his termination").
In view of these circumstances, the Court finds that a trier of fact reasonably could infer that after Galambos's heart attack, which pointed up the physical vulnerability of this fifty-one year old employee, Scales created an opportunity to discharge the aging Galambos and replace him with someone substantially younger. See Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 835 (8th Cir.2000) (holding that evidence of overt discrimination, coupled with a showing that the employer had falsely stated that an outside consultant had made the termination decision, were adequate to raise an inference of illegal age discrimination). For the foregoing reasons, the Court shall deny Scales's motion for summary judgment as to his age discrimination claims.

2. Galambos's Claims of Disability Discrimination

To establish a prima facie case of discrimination under the ADA, Galambos must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job, with or without accommodation; (3) and he suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination. Allen v. Interior Construction Services, Ltd., 214 F.3d 978, 980-81 (8th Cir.2000). Under the ADA, "Disability" is defined as "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Galambos does not claim that he was actually disabled at the time of his termination but claims that Scales discriminated him because of a record of disability and because the company regarded him as disabled.
As an initial matter, Scales asserts that Galambos is barred from raising these claims because he failed to exhaust his administrative remedies on them before bringing this lawsuit. Scales argues that Galambos claimed discrimination based only on an actual disability, not "record of" or "regarded as" disability discrimination. "Exhaustion of administrative remedies entitling a claimant to bring a cause of action under [Title VII or the MHRA] requires a claimant to give notice of all claims of discrimination in the administrative complaint." Stuart v. General Motors Corp., 217 F.3d 621, 630 (8th Cir. 2000). "To determine whether an allegedly discriminatory action falls within the scope of a claim, the administrative complaint must be construed liberally in order to further the remedial purposes of applicable legislation...." Id. In this case, Galambos's Charge of Discrimination makes the following allegations:
1. I was employed by [Scales] as a[sic] Area Service Manager. I suffered a Heart attack in August 1996. I returned to work on September 30, 1996. On October 30, 1996, I was placed on a 90-day performance requirement. I was discharged on January 29, 1997.
2. On January 29, 1997, I was informed by a letter from Dave Ehrnschwender, Director of Service Operations, that I was being terminated due to performance issues of October 30, 1996.
3. I believe that I have been discriminated against because of my age, 51, and disability in violation of the Age Discrimination in Employment Act and the Americans with Disabilities Act.
Pl.Ex. 2 to Sur-Reply. The Court finds that Galambos's general allegation that he was discriminated against "because of ... disability" did not limit his claim to one of actual disability, only. Nowhere on his Charge does Galambos indicate that he *1125 limits his claims to actual disability. Moreover, as Galambos points out, the boxes on the Charge form on which a claimant must specify the cause of discrimination he alleges (race, sex, religion, and so forth) do not delineate the three categories of disability discrimination but simply offer a "disability" box to be marked. The Court certainly will not require Galambos to be more specific about his claims than the EEOC/MHRA Charge form. Cf. Harris v. SmithKline Beecham, 27 F.Supp.2d 569, 579 (E.D.Pa.1998) (finding that plaintiff had not administratively exhausted her retaliation or sex, age, or disability discrimination claims when plaintiff had checked only the box designated "race" on her EEOC Charge). In light of Galambos's general statement in his Charge that he was discriminated against because of disability, in violation of the ADA, the Court believes that the scope of an administrative investigation of this claim reasonably would have included an evaluation of each of the three prongs of disability under the statute. Stuart, 217 F.3d at 630-31. If, as Scales maintains, the EEOC did not in fact conduct an investigation of disability claims beyond actual disability, the Court will not, on that basis, penalize Galambos, who gave both the administrative agency and Scales adequate notice that he was asserting a general, inclusive claim of disability under the ADA. For these reasons, the Court is not persuaded by Scales's argument that Galambos did not properly exhaust his ADA claims.
The Court first considers whether Galambos has made a prima facie showing that Scales discharged him because of a record of an impairment that substantially limits a major life activity. See 29 C.F.R. § 1630.2(k) ("[A] record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more of the major life activities."). To make such a showing, Galambos must demonstrate both that the record of impairment existed at the time of his termination and that Scales relied upon the record of impairment in making this adverse employment decision. See Equal Employment Opportunity Commission, Technical Assistance Manual § 2.2(b). The Court notes that although the EEOC Technical Assistance Manual includes among its examples of individuals who would fall under the "record of" provision of the ADA "people with a history of ... heart disease," the agency's regulations, supra, make clear that even a listed disease must constitute an impairment that substantially limits a major life activity. See also Weber v. Strippit, Inc., 186 F.3d 907, 913 (8th Cir.1999) ("That [plaintiff's] heart disease substantially impacts his cardiovascular system does not automatically render him disabled under the ADA.").
Galambos contends that because he had a heart attack, with symptoms of crushing chest pain and difficulty breathing, and was treated with angio-plasty and atherectomy, he has a record of a disability. Assuming that Scales had documentation of Galambos's heart attack and hospitalization (a question which neither party directly addresses), these events do not dictate an automatic finding that Galambos had a record of disability. See Gutridge v. Clure, 153 F.3d 898, 901 (8th Cir.1998) (rejecting argument that simply being hospitalized establishes a record of impairment under the ADA); Hilburn v. Murata Electronics North America, Inc., 17 F.Supp.2d 1377, 1382 (N.D.Ga. 1998) (finding that employer's approval of medical leaves of absence for employee as a result of her heart attack "establishes neither a history of, nor a misclassification of', Plaintiff suffering from a physical impairment limiting one or more of her major life activities). In a recent case, the Eighth Circuit, stressing that an ADA *1126 claimant must present "documentation" to show a record of disability, declared, "We do not believe that [defendant's] mere knowledge of [plaintiff's] heart attack, coupled with the sending of a get-well card and a note about her job duties, constitutes sufficient documentation that [plaintiff] had a history of disability or that [defendant] misclassified her as disabled within the meaning of the ADA." Taylor v. Nimock's Oil Co., 214 F.3d 957, 958-59 (8th Cir.2000). Galambos presents even less documentation than that which the Eighth Circuit found inadequate in Taylor. Moreover, as the Eighth Circuit has pointed out, disability under the ADA requires permanent or long-term impairments, not temporary, post-surgical impairments. Gutridge, 153 F.3d at 901-02 (citing 29 C.F.R. Pt. 1630, App. § 1630.2(j)). Galambos does not claim to have suffered from an actual disability  that is, a permanent or long-term impairment  at the time of his termination, and he has presented no evidence to suggest that he had a record of such an impairment, either. The Court concludes that Galambos has not made a prima facie showing that Scales discharged him because of a record of a disability.
The Court next considers whether Galambos has established that he was "regarded as" having a disability for the purposes of his prima facie case under the ADA. Galambos must show either that (1) Scales mistakenly believed that he has a physical impairment that substantially limits one or more major life activities or that (2) Scales mistakenly believed that an actual, nonlimiting impairment substantially limits one or more major life activities. Sutton v. United Air Lines, Inc., 527 U.S. 471, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450 (1999). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual  it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. The purpose of this definition of disability is to protect individuals "rejected from a job because of the `myths, fears and stereotypes' associated with disabilities." Id. at 2150 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(1)). Galambos asserts that Scales regarded him as substantially limited in his ability in the major life activity of working. See 34 C.F.R. § 104.3(j)(2)(ii); 45 C.F.R. § 84.3(j)(2)(ii) (defining "major life activities" as basic functions of life "such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working"). "An employer does not regard an employee as disabled simply by finding the employee incapable of satisfying the singular demands of a particular job." Mastio v. Wausau Service Corp., 948 F.Supp. 1396, 1415 (E.D.Mo.1996). "The proper test is whether the impairment, as perceived, would affect the individual's ability to find work across the spectrum of same or similar jobs." Id.; see also Sutton, 119 S.Ct. at 2151-52 (plaintiffs with vision impairment were not "regarded as" substantially limited in major life activity of working because they failed to show employer regarded their impairment as precluding them from a substantial class of jobs). Noting this standard, Orme v. Swifty Oil, Inc. explored further how an ADA plaintiff might prove that his employer regarded him as being disabled:
An employer who "regards" an employee as disabled, however, is most likely to focus on an employee's perceived inability to perform one job  his own  perhaps without worrying too specifically about whether the perceived condition might also limit his ability to perform a broader class of jobs. The real problem here is one of proof. How broadly did the employer, subjectively, view the employee's impairment? Direct evidence *1127 on that issue is likely to be scarce, but that does not mean that "regarded as" discrimination on the basis of disability is rare.
The Supreme Court addressed a similar problem of proof under the Eighth Amendment in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment prohibits prison and jail officials from acting with "deliberate indifference" to a prisoner's basic, minimal needs for health and safety. In Farmer, the Supreme Court held that "deliberate indifference" refers to the prison official's subjective state of mind, requiring proof that the prison "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S.Ct. 1970. The Court went on to explain, however, that whether the defendant official had "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Id. at 842, 114 S.Ct. 1970. Thus, a jury can infer that an official had actual knowledge of a risk based on evidence that the risk was obvious. Id.

Similarly here, the issue of the employer's subjective perception of the degree of [plaintiff's] impairment can be addressed through circumstantial evidence.
2000 WL 682678, at *6-7 (S.D.In.2000). Likewise, in Cinelli v. U.S. Energy Partners, 77 F.Supp.2d 566, 575 (D.N.J.1999), the court found that plaintiff's evidence of "a series of occurrences" "taken in combination" raised genuine issue of fact as to whether plaintiff's supervisors believed that he could not effectively perform his job because he had been diagnosed with terminal cancer. In particular, the court noted that after plaintiff informed his supervisors that he had cancer, his supervisor required a sales quota of him. When plaintiff expressed his concern about meeting this quota because of illness-related absences from work, his supervisor reassured and encouraged him. Two day after he reported his diagnosis of terminal cancer, his supervisors called a meeting to review his performance and fired him the next day. Plaintiff's employer stated that he was fired for failing to develop new sales prospects. Id. The court found that these circumstances, inter alia, were sufficient to create a factual dispute as to whether plaintiff's employer regarded him as disabled. Id.
In this case, Galambos had received a "fully meets expectations" performance review in the months before his heart attack, and none of his supervisors warned him that he was in danger of losing his job if he did not improve his performance and that of his shop. Instead, the evidence suggests that his supervisors found some deficiencies in his running of the St. Louis shop and intended to work with him to improve those problematic areas. One month after his heart attack, however, Galambos was placed on a ninety day probation plan with demanding requirements. Although he returned to working full time, did not ask for accommodation because of his heart attack, and exceeded the expectations of the sales and profit goals in the Plan, Scales fired him shortly before receiving confirmed figures of Galambos's performance. The Court finds that these events, taken in combination, create a factual dispute as to whether after Galambos's heart attack, Scales's perception of him changed from regarding him as a decent, reliable, long-term employee to regarding him as an employee who could not possibly perform adequately because he had suffered a heart attack. Therefore, the Court finds that Galambos *1128 has made a prima facie showing that Scales regarded him as substantially limited in his ability to work.
For the same reasons discussed supra in the Court's analysis of Galambos's ADEA claim, the Court finds that Galambos has established that he was qualified to perform the essential functions of his job. Although Scales does not appear to challenge the third element of Galambos's prima facie case, the Court finds that the timing of Galambos's placement on probation, one month after his heart attack, and termination near the end of his probation period is sufficient to give rise to an inference that he suffered an adverse employment action because of illegal discrimination. See Katz v. City Metal Co., Inc., 87 F.3d 26, 33 (1st Cir.1996). For these reasons, the Court finds that Galambos has set forth a prima facie case of disability discrimination.
As set forth supra, Scales has provided a legitimate nondiscriminatory reason for terminating Galambos, asserting that the company decided to demote him for failing to achieve all five of the performance goals in during his probation period, and that, after receiving information about a complaint from Schlereth that Galambos had sexually harassed her, Hart decided to terminate Galambos instead of demoting him.
For the reasons detailed in the Court's pretext analysis of Galambos's age discrimination claims, the Court also finds that Galambos has raised a material fact dispute as to whether Scales's stated reasons for terminating him are a pretext for intentional disability discrimination. Moreover, Galambos's pretext showing as to his ADA claim is buttressed by the timing of Scales's actions. That Scales's termination of Galambos followed so closely on the heels of his return from medical leave after suffering a heart attack is sufficient evidence from which a reasonable finder of fact could infer that the company intentionally discriminated against him because of that event, and that the company's stated reasons, that his previously satisfactory performance had become, after his heart attack, intolerable, were pretextual. See Ostrowski v. Atlantic Mutual Ins. Companies, 968 F.2d 171, 183 (2d Cir.1992) (in ADEA case, where plaintiff, who had previously received excellent performance reviews, was criticized for hiring older employees, and subsequently placed on probation and then terminated, the court found that the sequence of these events was sufficient evidence from which a jury could infer age discrimination). Having found that Galambos has met his burdens of proof in opposing Scales's motion for summary judgment as to his disability claims, the Court shall deny Scales's motion for summary judgment as to these claims.
Accordingly,
IT IS HEREBY ORDERED that Defendant Fairbanks Scales ("Scales") Motion for Summary Judgment [document # 84] is DENIED.
NOTES
[1] Because federal employment discrimination decisions are applicable and authoritative under the MHRA, Tart v. Hill Behan Lumber Co., 31 F.3d 668, 671 (8th Cir.1994), the Court shall analyze jointly Galambos's ADEA and MHRA age discrimination claims, as well as his ADA and MHRA disability discrimination claims. For the same reason, the Court rejects Scales's contention that because Galambos did not directly address his MHRA claims in his response to Scales's motion for summary judgment, the Court should grant summary judgment as to those claims.
[2] "Over-budget," in this context, means that Galambos exceeded Scales's performance expectations.
[3] These goals were as follows: (1) revenue performance for the combined months of November, December, and January a minimum of ten percent greater than forecast, or $197,000; (2) field operation profit ("FOP") performance for the combined months of November, December, and January a minimum of 18% of revenue goal, or $35,500; (3) average a minimum of twenty-five quotations per month for the period November through January (a quotation is a proposal for a future sale of scales to a potential customer); (4) review all existing contracts for appropriate increases by December 1, 1996; and (5) conduct weekly meetings with all Support Center personnel to plan scheduled activities, discuss problems and opportunities, and reinforce growth objectives and their responsibilities to same, with written documentation of these meetings.
[4] Scales asserts that statements made to the EEOC are inadmissible in further court proceedings. The case law that Scales cites to support this argument does not delineate such a bright line rule, however. Instead, the Eighth Circuit has stated that "In an employment discrimination case, the decision whether to admit or exclude administrative findings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court." Doss v. Frontenac, 14 F.3d 1313, 1318 (8th Cir.1994). These "investigation matters" may include position statements to the EEOC. See id. (considering trial court's refusal to admit EEOC position statements as evidence at trial). Because Doss found only that the trial court's disallowal of position statements did not prejudice plaintiff during the trial of his case, this Court does not believe that Doss offers specific guidance on the issue before it. Moreover, federal courts have considered position statements when deciding motions for summary judgment, particularly when those statements constitute evidence of an employer's motivation in taking an adverse employment action against an employee. See McInnis v. Alamo Community College District, 207 F.3d 276, 282 (5th Cir.2000); EEOC v. Rockwell Internat'l Corp., 60 F.Supp.2d 791, 793 (N.D.Ill.1999). While some courts have excluded EEOC administrative findings as unduly influential on a jury, the position statements in question here were written by Scales and thus should not prejudice it. Further, their probative value as evidence that Scales may have offered fluctuating reasons for terminating Galambos outweighs any possible prejudice to Scales. Finally, Scales consistently incorporated its position statements and supplemental responses to the EEOC into its responses to Galambos's interrogatories, despite the Court's order that Scales refrain from such incorporation. It is disingenuous of Scales to now claim that its EEOC position statements should not be included in the record before the Court.